## Robert Audette *vs.* Commonwealth.

No. 03-P-1233.

Norfolk. June 8, 2004. - June 13, 2005.

Present: Armstrong, C.J., Gelinas, & Berry, JJ.

*Governmental Immunity. Public Employment,* Police. *Dog. Strict Liability. Negligence,* Foreseeability of harm.

In an action for personal injuries sustained by a police officer who was bitten by a police-trained dog in the care of a State trooper, a Superior Court judge properly granted summary judgment in favor of the Commonwealth, where the Commonwealth was immune from liability for any claim based on the State trooper's failure to train or supervise the dog, or his failure to remove the dog from service, pursuant to the discretionary function exclusion found in § 10(*b*) of the Massachusetts Torts Claims Act, G. L. c. 258. [729-731]

Although § 10(*j*) of the Massachusetts Torts Claims Act, G. L. c. 258, did not bar a police officer's negligence claim against the Commonwealth for personal injuries he sustained when bitten by an unleashed dog released by a State trooper who trained the dog [731-733], principles of sovereign immunity precluded the imposition of strict liability under G. L. c. 140, § 155, the dog bite statute [734-736], and common-law negligence principles dictated summary judgment in favor of the Commonwealth, where the plaintiff failed to show that the trainer knew or should have known of the dog's vicious propensities [736-737].

CIVIL ACTION commenced in the Superior Court Department on October 10, 2001.

The case was heard by *Maria I. Lopez,* J., on a motion for summary judgment.

*Stephen J. Delamere* for the plaintiff.

*Joseph Callanan,* Assistant Attorney General, for the Commonwealth.

GELINAS, J. A judge in the Superior Court granted the Commonwealth's motion for summary judgment on Robert Audette's claim seeking damages for personal injuries sustained when Audette was bitten, on July 27, 1999, by Rocky, a police-trained

dog in the care of State Trooper John Tasker. The Commonwealth contends, and the judge agreed, that Audette's claim was barred by G. L. c. 258, § 10(*b*) and (*j*). In her ruling, the judge did not reach the Commonwealth's further argument that the claim was barred by common-law principles. We affirm the grant of summary judgment, but for reasons different from those cited by the judge.

"The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991), citing Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). See *Judson* v. *Essex Agric. & Tech. Inst.*, 418 Mass. 159, 162 (1994); *Annese Elec. Servs., Inc.* v. *Newton*, 431 Mass. 763, 764 n.2 (2000). "[W]e resolve any conflicts in the summary judgment materials, and we make all logically permissible inferences," in the nonmoving party's favor. *Willitts* v. *Roman Catholic Archbishop of Boston*, 411 Mass. 202, 203 (1991).

In affirming summary judgment, we may rely on grounds different from those relied upon by the judge. *Vaughan* v. *Eastern Edison Co.*, 48 Mass. App. Ct. 225, 226 (1999), citing *Hawthorne's, Inc.* v. *Warrenton Realty, Inc.*, 414 Mass. 200, 210 n.6 (1993). Here, the judge concluded that Audette's claim was barred by G. L. c. 258, § 10(*b*) and (*j*). We disagree with regard to § 10(*j*), but on review of all of the summary judgment materials, we conclude that G. L. c. 140, § 155, providing strict liability for dog bites, is inapplicable, and that under the common-law theory of liability, as there was no evidence that the dog's vicious propensities, if any, were known, Audette may not recover, and summary judgment must be granted.

The summary judgment materials before us establish the following undisputed facts, which we view in the light most favorable to Audette. Audette was a police officer with the Randolph police department. On July 27, 1999, he was present at the Randolph police station and participated in the search of a motor vehicle suspected of containing illegal narcotics. The search revealed some narcotics, and the Randolph police sought the assistance of Tasker and Rocky, a drug-sniffing dog, to conduct a more thorough search.

Arriving at the police station parking lot, Tasker took Rocky from the cruiser, and allowed the dog to run loose in the parking area where the vehicle to be searched was located. Audette and a Randolph police detective inquired of Tasker whether it was safe to allow Rocky to run loose. Tasker responded that Rocky performed for audiences of children, and that the dog would be fine.

Tasker then began his search by walking Rocky along the vehicle's driver's side. Rocky remained unleashed. Audette was near the front of the vehicle. After sniffing and walking along the driver's side, Rocky suddenly approached Audette at a gallop, with mouth open and teeth showing. On reaching Audette, Rocky jumped up and bit Audette's right arm. Tasker immediately grabbed Rocky by the collar, pulled him off Audette, yelled at Rocky, and placed Rocky in the cruiser. Audette suffered a serious and permanent injury as a result of the bite.

The record establishes that at the time of the incident Tasker had been assigned to the State police K-9 unit for eleven years, and had been Rocky's handler for five of those eleven years; that Tasker had received specialized training as a K-9 handler with canines specializing in narcotics searches; that he trained with Rocky for eight hours each week; that Rocky is trained to conduct searches of buildings and vehicles, and is also trained to track and apprehend suspects, and to engage in crowd control; and that Rocky is certified annually by the New England State Police Administrative Council. The record further establishes that Rocky resides in Tasker's home, and plays with Tasker's three young children. Prior to this incident, Tasker never saw Rocky bite or injure anyone or display any temper or viciousness or engage in an unordered attack on anyone, nor was he ever informed of such behavior by Rocky. Tasker avers that he did not order Rocky to attack Audette, but that Rocky is trained to attack on command, and to attack if threatened or injured. The record also reveals that Rocky was injured in June of 1999, and was out of service for four to six weeks.

*Governmental immunity under G. L. c. 258, § 10(b).* The Massachusetts Tort Claims Act (Act) provides that public employers, including the Commonwealth, are liable "for injury or loss of property or personal injury or death caused by the negligent

or wrongful act or omission of any public employee while acting within the scope of his office or employment . . . ." G. L. c. 258, § 2. The Act "abolished general sovereign immunity in Massachusetts," while retaining the Commonwealth's immunity for certain stated types of actions. See *Tivnan* v. *Registrar of Motor Vehicles*, 50 Mass. App. Ct. 96, 99 (2000).

The judge ruled, and we agree, that the Commonwealth was immune from liability for any claim based on Tasker's failure to train or supervise Rocky, or his failure to remove Rocky from service, pursuant to the "discretionary function" exclusion found in G. L. c. 258, § 10(*b*).[1] That claim falls squarely within the two-pronged test set out in *Harry Stoller & Co.* v. *Lowell*, 412 Mass. 139, 141 (1992), for determining whether a plaintiff's claim is foreclosed by the discretionary function exclusion.[2] With respect to the first step in the analysis, the summary judgment materials, read in the light most favorable to Audette, establish that Tasker, as Rocky's sole handler and keeper, had discretion as to what course of conduct to follow in Rocky's training and use as a police canine. Other than a "General Order" promulgated by the State police regarding the training and use of canines in State police work, Tasker's conduct in this regard was not specifically prescribed or proscribed by statute, regulation, or established agency procedure. The General Order itself, while specifying that K-9 officers must complete a training course, undergo maintenance training, and maintain individual training, does not specify either the manner or quantity of training the canines receive.

With respect to the second step of the test, a determination must be made whether the discretion is of the type afforded immunity by § 10(*b*). Use of specially trained canines to assist in

---

[1]General Laws c. 258, § 10(*b*), as appearing in St. 1978, c. 512, § 15, exempts from liability under the Massachusetts Tort Claims Act claims that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused."

[2]The first step is to determine "whether the [governmental] actor had any discretion to do or not to do what the plaintiff claims caused him harm . . . . The second . . . step is to determine whether the discretion that the actor had is that kind of discretion for which § 10(*b*) provides immunity from liability." *Harry Stoller & Co.* v. *Lowell*, 412 Mass. at 141.

police work reflects a judgment regarding public policy. We think that Tasker's decisions regarding the training and continued use of Rocky are corresponding decisions reflecting considerations of public policy. See *Sena* v. *Commonwealth*, 417 Mass. 250, 256 (1994) (police officers' decisions about "whether, when, how, and whom to investigate" are within officers' discretion and render them immune from liability under § 10[*b*]).

We may also consider "[i]f the injury-producing conduct was an integral part of governmental policymaking or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the case could not be decided without usurping the power and responsibility of either the legislative or executive branches of government." *Harry Stoller & Co.* v. *Lowell*, 412 Mass. at 142, citing *Whitney* v. *Worcester*, 373 Mass. 208, 219 (1977). We conclude that imposing liability for failure to train or remove Rocky from service, under circumstances such as these, would "jeopardize the quality and efficiency of the governmental process," as it would likely burden "enforcement of the laws." *Sena* v. *Commonwealth*, 417 Mass. at 258, quoting from *Whitney* v. *Worcester*, 373 Mass. at 219. As there was discretion here, "[c]ontinuing judicial criticism of . . . practices not otherwise unlawful, and therefore within the discretion of law enforcement officials, would impinge on the long-standing domain of the executive branch." *Ibid.*

*Governmental immunity under G. L. c. 258, § 10(j).*[3] The principal purpose of G. L. c. 258, § 10(*j*), is "to exclude liability for 'an act or failure to act to prevent or diminish' certain

---

[3]General Laws c. 258, § 10(*j*), as inserted by St. 1993, c. 495, § 57, sets forth the following exception to the Massachusetts Tort Claims Act: "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer. This exclusion shall not apply to:

"(1) any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his family or household by a public employee, provided that the injury resulted in part from reliance on those assurances. A permit, certificate or report of find-

'harmful consequences.' " *Brum* v. *Dartmouth*, 428 Mass. 684, 692 (1999), quoting from G. L. c. 258, § 10(*j*) (despite failure to provide security after warning that may have caused dangerous condition or situation, suit against town barred because town "failed to prevent" dangerous condition or situation). See *Kent* v. *Commonwealth*, 437 Mass. 312, 318-319 (2002) (claim alleging failure to act by reestablishing parole over third party barred; claim alleging affirmative act of paroling third party also barred because too remote in time); *Jacome* v. *Commonwealth*, 56 Mass. App. Ct. 486, 489 (2002) (plaintiff's son died while swimming at beach controlled and operated by Commonwealth; suit barred because Commonwealth did not create condition that caused death, i.e., dangerous tide).

"[T]here is immunity in respect to all consequences except where 'the condition or situation' was 'originally caused by the public employer.' " *Brum* v. *Dartmouth*, 428 Mass. at 692, quoting from G. L. c. 258, § 10(*j*). For a public employer to be liable, it must have committed an affirmative act that was the original cause of the injury. See *Bonnie W.* v. *Commonwealth*, 419 Mass. 122, 127-128 (1994). "We have also construed the 'original cause' language to mean an affirmative act (not a failure to act) by a public employer that creates the 'condition or situation' that results in harm . . . ." *Kent* v. *Commonwealth*, 437 Mass. at 318. See *Brum* v. *Dartmouth*, 428 Mass. at 695. We note that at this stage of the analysis, we do not consider whether the affirmative act in question was or was not negligent; rather, the public employer's affirmative act "must have materially contributed to creating the specific 'condition or situation' that resulted in the harm." *Jacome* v. *Commonwealth*, 56 Mass.

---

ings of an investigation or inspection shall not constitute such assurances of safety or assistance; and

"(2) any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention; and

"(3) any claim based on negligent maintenance of public property; [and]

"(4) any claim by or on behalf of a patient for negligent medical or other therapeutic treatment received by the patient from a public employee."

As we conclude that § 10(*j*) does not provide immunity on other grounds, we need not consider whether Tasker's assurance "that the dog would be fine" was of the kind contemplated in this exception.

App. Ct. at 489, quoting from *Kent* v. *Commonwealth*, 437 Mass. at 319. Even if a public employer does not create a dangerous condition or situation by an affirmative act, its failure to prevent or mitigate harm from that dangerous condition or situation may cause an injury. A claim based on such an injury is barred by § 10(*j*). See *Jacome* v. *Commonwealth*, 56 Mass. App. Ct. at 490.

To succeed, therefore, Audette must first demonstrate that there is at least a dispute as to whether Tasker acted in an affirmative way, and whether that affirmative act created the harmful condition or situation causing the injury. The Commonwealth argues that Audette offers no argument that an affirmative act was the original cause of the dangerous condition or situation that led to his injuries. The Commonwealth's argument in this regard is based primarily on the fact that Audette has framed his arguments mainly in the negative; that is, that Tasker failed to maintain control of Rocky, and failed to control the scene of the search. Audette attempts, the Commonwealth argues, to engage in the impermissible practice of "recasting the failures as affirmative acts." See *Brum* v. *Dartmouth*, 428 Mass. at 693. We think the argument unpersuasive. Shorn of circumlocution, which conflates concepts of action, negligence, and failure to act, the simple fact emerges: Tasker released the dog from the cruiser without restraint, and the unleashed dog bit Audette, causing harm. But for the release of the dog without restraint, the harm would not have occurred.

The facts here are readily distinguished from those in *Jacome* v. *Commonwealth*, *supra*, where the sea and the current caused the drowning, and *Brum* v. *Dartmouth*, *supra*, where a third party caused the death. This is the type of negligence claim against a public employer that should go forward, as it alleges "a condition leading to a harmful consequence, where that condition was originally caused by the public employer [but] not brought about by the public employer's failure to prevent it." *Brum* v. *Dartmouth*, 421 Mass. at 693. Tasker's alleged negligence is not premised solely on his failure to prevent or mitigate the dangers of a dog, but is premised on his affirmative act of releasing Rocky, unleashed, into the area. We conclude that Audette's claim is not barred by G. L. c. 258, § 10(*j*). This conclusion, however, does not end the inquiry.

*Strict liability.* In Massachusetts, by statute, owners and keepers of dogs are strictly liable for any harm done by their animal. General Laws c. 140, § 155,[4] replaces the older common-law rule that owners cannot be held liable in negligence for damage caused by their dog unless they had knowledge of a dog's vicious propensity. Under G. L. c. 140, § 155, "the owner or keeper of a dog is liable . . . for injury resulting from an act of the dog without proof . . . that its owner or keeper was negligent or otherwise at fault, or knew, or had reason to know, that the dog had any extraordinary, dangerous propensity, and even without proof that the dog in fact had any such propensity." *Rossi* v. *DelDuca*, 344 Mass. 66, 69 (1962), quoting from *Leone* v. *Falco*, 292 Mass. 299, 300 (1935). A plaintiff bears the burden of showing that he was not committing a trespass or other tort, and was not teasing, tormenting or abusing the dog. See *ibid.* The statute is indifferent to any question of negligence on the part of the owner. *Malchanoff* v. *Truehart*, 354 Mass. 118, 123 (1968). *Brown* v. *Buldoc*, 29 Mass. App. Ct. 909, 910 (1990).[5]

Principles of sovereign immunity preclude the imposition of strict liability under G. L. c. 140, § 155, in this case. Sovereign immunity shields the Commonwealth from suit in its own courts

---

[4]General Laws c. 140, § 155, as amended by St. 1968, c. 268, provides, "If any dog shall do any damage to either the body or property of any person, the owner or keeper, or if the owner or keeper be a minor, the parent or guardian of such minor, shall be liable for such damage, unless such damage shall have been occasioned to the body or property of a person who, at the time such damage was sustained, was committing a trespass or other tort, or was teasing, tormenting or abusing such dog. If a minor, on whose behalf an action under this section is brought, is under seven years of age at the time such damage was done, it shall be presumed that such minor was not committing a trespass or other tort, or teasing, tormenting or abusing such dog, and the burden of proof thereof shall be upon the defendant in such action."

[5]In order to protect law enforcement officers in K-9 units from the reach of the strict liability statute, the Legislature also passed G. L. c. 140, § 155A, inserted by St. 1972, c. 495, § 2, which addresses damage caused by dogs used by law enforcement officers in the performance of official duties. The statute states, "If an action is brought against a law enforcement officer because of damage caused by a dog which said officer was caring for or maintaining in connection with his official duties, the commonwealth or the political subdivision employing said officer shall indemnify him for expenses or damages incurred in the settlement or defense of such action . . . ." We are not concerned with this statute, as Audette brought suit against the Commonwealth, and did not join Tasker, the officer responsible for the dog.

unless it consents to such suit. In specific instances where the Commonwealth consents to suit, it may only be impleaded "in the manner and to the extent expressed . . . [by] statute." *Massachusetts Elec. Co.* v. *Athol One, Inc.*, 391 Mass. 685, 687 (1984), quoting from *Woodbridge* v. *Worcester State Hosp.*, 384 Mass. 38, 42 (1981). Statutory consent is strictly construed, and "must be expressed by the terms of a statute, or . . . by necessary implication from them." *Woodbridge* v. *Worcester State Hosp.*, 384 Mass. at 42. There is nothing in G. L. c. 140, § 155, that indicates, expressly or by implication, that the Commonwealth has waived its sovereign immunity with respect to claims made under the statute.

Although the Commonwealth has waived sovereign immunity for certain tort actions against it pursuant to the Act, and an action for ordinary or gross negligence is permitted under the Act because it constitutes "negligent or wrongful act or omission," *McNamara* v. *Honeyman*, 406 Mass. 43, 46 (1989), quoting from G. L. c. 258, § 2, there is no explicit or implicit waiver of the State's sovereign immunity written into the Act with respect to actions under G. L. c. 140, § 155. The dog bite statute is a strict liability statute, imposing liability without requiring misfeasance or nonfeasance by the owner or keeper, whereas these are conditions required for an action under G. L. c. 258.

We find support for this conclusion in the Federal cases construing the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) et seq. (1988) (FTCA), and in another State jurisdiction construing its version of the Act. The Act closely resembles its Federal counterpart, and Federal court decisions construing the provisions of the FTCA are helpful. *Sena* v. *Commonwealth*, 417 Mass. at 255. Actions against the United States based on strict liability cannot be maintained under the FTCA, and therefore are barred by sovereign immunity. See *Dalehite* v. *United States*, 346 U.S. 15, 45 (1953) (FTCA precludes imposition of liability if there has been no negligence or wrongful act or omission; some form of misfeasance or nonfeasance required); *Laird* v. *Nelms*, 406 U.S. 797, 798-799 (1972) (FTCA does not permit claims based upon strict liability; must be some "negligent or

wrongful act," and phrase "wrongful act" does not import claim under strict liability concept); *In re: Bomb Disaster at Roseville, California, on April 28, 1973,* 438 F.Supp 769, 779-781 (E.D.Cal. 1977) (FTCA to be construed strictly; no waiver of sovereign immunity with respect to strict liability claims.)

The Iowa Tort Claims Act is patterned after the FTCA, and defines a claim, as does Massachusetts, in terms of a "negligent or wrongful act or omission." Iowa Code § 25A.2(5)(b) (1983). In holding that an action for strict liability against the State was not available under the Iowa statute, the court noted that when the Iowa Legislature adopted the Federal language defining permitted claims, it knew that the United States Supreme Court had excluded claims based on strict liability. *Hoctel* v. *Iowa,* 343 N.W.2d 832, 833 (1984). We think this reasoning instructive; the Act was initially passed in 1978, after the United States Supreme Court decisions in *Dalehite* v. *United States, supra,* and *Laird* v. *Nelms, supra.*

*Common-law principles.* In the absence of a controlling statute, we revert to the application of common-law principles. *Andrews* v. *Jordan Marsh Co.,* 283 Mass. 158, 162 (1933) (if "no statute intervenes, the liability for bodily injuries caused by dogs falls within the general principles governing liability for injuries caused by animals ordinarily harmless"). At common law, for a dog owner or keeper to be liable in negligence for injuries caused by the dog, the plaintiff must prove that the owner or keeper knew or should have known of the dog's vicious propensities. *Id.* at 161-162. See *Goodwin* v. *E.B. Nelson Grocery Co.,* 239 Mass. 232, 234 (1921) (storekeeper not liable to customer for injuries caused by domestic cat where no evidence that cat was vicious). Without such proof, there can be no liability. *Splaine* v. *Eastern Dog Club, Inc.,* 306 Mass. 381, 385 (1940), quoting from *Dix* v. *Somerset Coal Co.,* 217 Mass. 146, 147 (1914) ("If such animal is rightfully in the place where the mischief is done, unless it appears that the animal is vicious and that that fact is known to the owner or keeper, there is no liability").

Audette argues that Tasker knew of Rocky's vicious propensities because Tasker trained Rocky to apprehend suspects. We

think the argument without merit. There is no Massachusetts precedent in this area. The State of Oregon, however, has considered the matter, and we think their resolution meritorious. In *Borden* v. *Salem*, 249 Or. 39 (1968), the Oregon Supreme Court specifically rejected the argument raised by Audette, that training a dog to apprehend suspects, without more, establishes knowledge of the dog's vicious propensities. The court ruled that there was "no evidence that the training of the dog for police work had imbued it with dangerous propensities," and that the simple fact that the dog was trained for police work was not enough to establish that the defendant city "knew of the dog's vicious propensities." *Id.* at 43. Here Audette provides no evidence of any prior bite, breach of discipline, or unordered attack on anyone, but merely argues that the court should have found vicious propensity based solely on the evidence that Tasker trained Rocky to apprehend suspects. Absent such showing, summary judgment for the Commonwealth was appropriate.

*So ordered.*