PATRICK J. DEVLIN vs. COMMONWEALTH.

No. 12-P-401.

Suffolk. October 11, 2012. - April 24, 2013.

Present: KANTROWITZ, SIKORA, & RUBIN, JJ.

*Massachusetts Tort Claims Act. Governmental Immunity. Commonwealth,* Liability for tort. *Negligence,* Governmental immunity, Correctional facility. *Incompetent Person,* Commitment.

The Commonwealth was not immune from liability under G. L. c. 258, § 10(*b*), in a civil action alleging negligence against it, brought by a plaintiff who, while civilly committed to a State hospital that was part of a correctional facility, was attacked by a criminal convict who was a "trustee" working in the civil commitment area in which the plaintiff was housed and being treated, where the Commonwealth lacked discretion to allow the convict into that area, given that, while G. L. c. 123, § 35, permits housing and treatment of civilly committed individuals in a correctional facility under certain circumstances, the statute is clear that where and when such individuals are housed and treated in such a facility, they must be kept separate from convicts [532-534]; further, the Commonwealth was not immune from liability under G. L. c. 258, § 10(*j*), where the Commonwealth's affirmative decision to allow convicted inmates to work in an area in which civilly committed individuals were housed and treated was one of the original causes of the harmful consequences to the plaintiff [534-535].

CIVIL ACTION commenced in the Superior Court Department on November 12, 1998.

The case was tried before *Christopher J. Muse,* J., and a motion for judgment notwithstanding the verdict or for a new trial, as well as a motion for remittitur, were considered by him.

*Brian P. Mansfield* for the Commonwealth.

*Joshua M.D. Segal* for the plaintiff.

RUBIN, J. The following facts are taken from the undisputed testimony at the trial in the Superior Court. The plaintiff, Patrick J. Devlin, was on November 1, 1995, civilly committed to Bridgewater State Hospital under G. L. c. 123, § 35, on the petition of

his wife, who feared he was a danger to himself because of his alcoholism. Devlin was housed and treated with other civilly committed individuals in the Massachusetts addiction center, which was part of the Southeastern Correctional Center in Bridgewater. In addition to civilly committed individuals, present at the addiction center were guards and members of the inner perimeter security (IPS) unit. There were also "trustees," criminal convicts who worked in the civil commitment area doing laundry, sweeping, and other janitorial chores.

On Thanksgiving afternoon, November 23, 1995, Devlin sought to make a telephone call to his wife to let her know that he was not angry at her for having him civilly committed. It was after lunch and, while most of the other civilly committed individuals were watching football on television, Devlin was on his bunk in the room in which he slept. Those seeking to make a telephone call were required to place their nametags on a post near a telephone about forty-five feet from Devlin's bunk. The nametags formed a list and when someone's tag was first on the list, it would be that individual's turn to place a call.

It being Thanksgiving, everyone sought to make a telephone call, and Devlin's tag was the last one. After one of the other civilly committed inmates came in and told Devlin it was his turn, he left his bunk and approached the telephone. When he reached for the telephone, a criminal convict working there told Devlin that he, the convict, would be using the telephone and that Devlin could not use it. Devlin then went to a second telephone. The convict followed him and told him, "You can't use this one, I am using this one"; Devlin replied, "Go ahead and use it."

Immediately thereafter and without any warning or provocation, the criminal convict struck Devlin in the side of his face.

There were many people in the common room that contained the telephones. A television was on, and many people were watching football. There was also a guard's station there with two guards in it. No one in the immediate area responded to the attack; Devlin returned to his bunk for a moment, then went to the bathroom to apply a wet towel to his now closing eye.

Devlin was eventually taken to the IPS office. When he told an IPS officer what had happened, the officer told him he was a

liar and started putting on tight black leather gloves, apparently in a threatening manner. Devlin was ordered to strip, with no explanation, and then was told to put his clothes back on. He ultimately saw a nurse, who concluded immediately that he needed to be seen by a doctor. Using an expletive, one of the IPS officers said, "Throw him in the cage," where Devlin was kept for another thirty minutes. He was then transported to Brockton Hospital.

A doctor at Brockton Hospital immediately concluded that Devlin was going to lose his eye. He was brought to the Massachusetts Eye and Ear Infirmary in Boston. All the bones were broken on the side of his face and one had punctured his eye, causing a white substance to ooze out.

Devlin lost the sight in his left eye and continues to have pain. Devlin brought this action for negligence against the Commonwealth. After trial in the Superior Court, a jury found the Commonwealth liable and returned a verdict in Devlin's favor in the amount of $450,000. After a hearing, the trial judge denied motions for judgment notwithstanding the verdict and for a new trial, but granted a motion for remittitur and reduced the judgment to $100,000 in accordance with G. L. c. 258, § 2, which provides that public employers shall not be liable for damages in excess of $100,000. Final judgment entered for the plaintiff in the amount of $100,000, and the Commonwealth has appealed.

*Discussion.* On the plaintiff's claim against the Commonwealth for damages under the Massachusetts Tort Claims Act (MTCA), G. L. c. 258, for negligently allowing the convict to work in the area of the addiction center where persons civilly committed were housed and treated, the Commonwealth claims it is immune from liability under G. L. c. 258, § 10(*b*), inserted by St. 1978, c. 512, § 15, which provides immunity against "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused."

The analysis of such a claim involves two steps. First, the Commonwealth must demonstrate that the governmental actor

had discretion as to what course of conduct to follow. Second, the Commonwealth must demonstrate that "the discretion that the actor had is that kind of discretion for which § 10 (*b*) provides immunity from liability." *Harry Stoller & Co.* v. *Lowell*, 412 Mass. 139, 141 (1992). The type of discretionary decisions which may not form the basis for liability under § 10(*b*) are those "with respect to public policy and planning." *Id.* at 142, quoting from *Whitney* v. *Worcester*, 373 Mass. 208, 218 (1977).

We need not determine whether the decision to allow convicted inmates to work in the area where the assault on Devlin took place involved a question of policy or planning because we conclude that the Commonwealth lacked discretion to allow the convict into that area. General Laws c. 123, § 35, fourth par., as appearing in St. 1987, c. 500, provides for involuntary civil commitment for alcoholics "for the purpose of inpatient care in public or private facilities . . . for the care and treatment of alcoholism." It allows civil commitment to the Massachusetts Correctional Institution at Bridgewater for male alcoholics but only if "there are not suitable [public or private] facilities available under [G. L. c. 111B]" (facilities approved by the department of Public Health that "provid[e] services especially designed for the detoxification of intoxicated persons or alcoholics"[1]), and with the further proviso "that the person so committed shall be housed and treated separately from convicted criminals." G. L. c. 123, § 35, fourth par.

Devlin was assaulted in the area in which he was housed. He was trying to use the telephone near his bedroom that was provided for purposes of allowing the civilly committed to make personal telephone calls, including calls to their families. This is where Devlin was housed, and the statute is best read to require that while in that area he was required to be "separate[] from convicted criminals."

The Commonwealth points out that the Legislature has used broader language with respect to protecting other civilly committed populations from convicted criminals. In particular, the Commonwealth notes that St. 1990, c. 150, § 104, requires that persons committed as sexually dangerous persons to the Mas-

---

[1]General Laws c. 111B, § 3, inserted by St. 1971, c. 1076, § 1 (definition of "[f]acility").

sachusetts Treatment Center "shall at all times remain separate and apart from department of correction inmates." To be sure, the statute with respect to sexually dangerous persons is broader than that with respect to those, like Devlin, civilly committed for alcoholism or substance abuse. This likely reflects the substantially greater danger faced by certain sexually dangerous civilly committed persons who may have committed sex crimes that, even among the population of convicted criminals, are widely considered among the most heinous.

Nonetheless, we think the language of G. L. c. 123, § 35, is clear. While there may be times when persons civilly committed under § 35 need not be "separate and apart" (St. 1990, c. 150, § 104) from all convicted criminals, G. L. c. 123, § 35, requires that where and when they are "housed and treated," they must be kept "separate[]." If there were any ambiguity in this language, we think the clear purpose of the Legislature would be best served by this reading. The Legislature allowed civil commitment to Bridgewater only as a second-best alternative for those times when no space elsewhere was available. Apparently recognizing the danger inherent in this, it included a proviso about separation from criminal convicts obviously designed to protect the wholly innocent civilly committed persons from the risk of violence. The legislative purpose would not be well served by the reading proposed by the Commonwealth, which argues that criminal convicts can have contact with the civilly committed so long as the convicts are not themselves "housed" or "treated" in the same place as the civilly committed persons. We think any such reading would undermine substantially the legislative purpose to provide protection to those civilly committed. Indeed, we would find it difficult to articulate a purpose that would be furthered by allowing, as the Commonwealth's reading would, essentially unlimited daytime contact between civilly committed individuals and convicted criminals except during periods of "treatment."

The Commonwealth also argues that it is entitled to immunity under § 10(j) of the MTCA. It would be entitled to this immunity only if the Commonwealth had not "originally caused" the dangerous condition or situation that resulted in the plaintiff's injuries. G. L. c. 258, § 10(j), inserted by St. 1993, c. 495,

§ 57. It is true that mere failure to act cannot under this provision give rise to liability by the Commonwealth. *Kent* v. *Commonwealth*, 437 Mass. 312, 318 (2002). In this case, there was, however, not a mere failure to act by the Commonwealth. Rather, the affirmative decision to allow convicted inmates to work in an area where civilly committed individuals were housed and treated was one of the "original[] cause[s]," G. L. c. 258, § 10(*j*), of the harmful consequences within the meaning of the statute. See *Harrison* v. *Mattapoisett*, 78 Mass. App. Ct. 367, 371-372 (2010). The question is whether the acts "materially contributed to creating the specific 'condition or situation' that resulted in the harm" to the plaintiff. *Id.* at 371, quoting from *Kent* v. *Commonwealth*, 437 Mass. at 319. The Commonwealth's decision was not so remote from the injury that it can be considered not to have been an original cause.

Finally, the Commonwealth contends that the evidence was insufficient to support the finding of negligence. In this regard, and viewing the evidence in the light most favorable to the plaintiff, as we must, there was sufficient evidence to support the jury's conclusion.

*Judgment affirmed.*