NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-340                                          Appeals Court

JANE J.[1]  vs.  COMMONWEALTH.

No. 15-P-340.

Suffolk.     April 26, 2016. - April 12, 2017.

Present:  Kafker, C.J., Cypher, Rubin, Maldonado, & Massing, JJ.[2]


Practice, Civil, Summary judgment.  Massachusetts Tort Claims
     Act.  Governmental Immunity.  Commonwealth, Claim against,
     Liability for tort.  Negligence, Hospital, Proximate cause,
     Governmental immunity.  Proximate Cause.


     Civil action commenced in the Superior Court Department on
December 5, 2011.

_____

     [1] A pseudonym.

     [2] This case was initially heard by a panel comprised of
Justices Rubin, Maldonado, and Massing.  After circulation of a
majority and dissenting opinion to the other justices of the
Appeals Court, the panel was expanded to include Chief Justice
Kafker and Justice Cypher.  Following the expansion of the
panel, the court ordered a rehearing of the case before the
expanded panel.  See Sciaba Constr. Corp. v. Boston, 35 Mass.
App. Ct. 181, 181 n.2 (1993).

     Justice Cypher participated in the deliberation on this
case while an Associate Justice of the court, prior to her
appointment as an Associate Justice of the Supreme Judicial
Court.

The case was heard by Elizabeth M. Fahey, J., on a motion for summary judgment.

John E. Zuccaro, III, for the plaintiff.
Anne M. McLaughlin, Assistant Attorney General, for the Commonwealth.

MALDONADO, J.  The plaintiff filed a complaint against the Commonwealth under the Massachusetts Tort Claims Act, G. L. c. 258 (MTCA), alleging that, while she was committed to a locked unit of Tewksbury State Hospital, a similarly committed male patient raped her while she was watching television in a recreation room that is shared by both the male and female patients of that unit.  The only issue before us is whether the hospital's failure to segregate by gender its patients' use of a common recreation room constitutes an "original cause" of the rape.  See G. L. c. 258, § 10(j).[3]  Concluding that it does not, we affirm the summary judgment entered in favor of the Commonwealth.

---

[3] General Laws c. 258, § 10(j), inserted by St. 1993, c. 495, § 57, immunizes public employers from suit under the MTCA for

> "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer."

Background.[4]  Tewksbury State Hospital evaluates and treats patients with varying degrees of mental illness.  The hospital's Hathorne Unit is a locked unit that houses, on separate corridors, both male and female patients.[5]  Male patients are not permitted access onto the female corridor, and female patients are not permitted access onto the male corridor, except that patients of both genders enjoy nearly free access to a common recreation room.  The recreation room contains a ping-pong table, some other games, and a television set; it also leads to a common sunroom which offers a second television set for patient viewing.  The common rooms are not staffed or equipped with video surveillance, but hospital staff conduct safety checks in the rooms every thirty minutes.

---

[4] We take the facts from the statement of material facts submitted in connection with the Commonwealth's summary judgment motion.  We view any factual disputes in the light most favorable to the plaintiff as the nonmoving party.  See Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 550 n.6 (2008); Harrison v. Mattapoisett, 78 Mass. App. Ct. 367, 370 (2010).  Thus, we credit the plaintiff's evidence that she was raped.

[5] The summary judgment record is silent regarding what types of patients are assigned to the Hathorne Unit, how placement decisions are made, who makes them, or who, other than the plaintiff and her assailant, was housed there.  The record does include evidence that when a patient is admitted to the hospital, the Department of Mental Health's division of forensic mental health services conducts a check of the patient's criminal background and queries the Sex Offender Registry Board to determine whether the patient is a registered sex offender or has a history of sexual offenses.

In March, 2009, a District Court judge committed the plaintiff, who had been charged with an assault and battery, to the hospital for a competency evaluation under G. L. c. 123, § 15(b).[6] She was assigned to the Hathorne Unit. The plaintiff alleges that about three weeks into her commitment, she was watching television in the sunroom when a male patient entered the sunroom and forcibly raped her.[7]

Like the plaintiff, the male patient was also hospitalized on a court-ordered mental health evaluation in connection with an open criminal charge.[8] While the male patient had a criminal history that included convictions for assaultive behavior, a Department of Mental Health background check revealed that he was not a registered sex offender and, further, that his criminal history "did not suggest that he posed any risk of

---

[6] Under G. L. c. 123, § 15(b), as amended through St. 2000, c. 357, a judge in a criminal case may order a defendant to be "hospitalized at a facility or, if such person is a male and appears to require strict security, at the Bridgewater state hospital . . . to determine whether mental illness or mental defect have so affected a person that he is not competent to stand trial or not criminally responsible for the crime or crimes with which he has been charged."

[7] The rape resulted in a pregnancy, which subsequently resulted in a miscarriage.

[8] There is no evidence that either the plaintiff or the male patient was held on bail.

committing a sexual assault or other violent sex offending behavior."[9]

In December, 2011, the plaintiff filed this tort action alleging that the Commonwealth's negligence caused the sexual assault, the unwanted pregnancy, and the subsequent miscarriage. The Commonwealth moved for summary judgment on the ground that it was immune from suit under § 10(j) of the MTCA. A judge of the Superior Court allowed the motion and entered summary judgment for the Commonwealth. This appeal followed.

Discussion. Summary judgment is appropriate where "all material facts have been established and the moving party is entitled to a judgment as a matter of law." Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991). "In reviewing a grant of summary judgment, 'we assess the record de novo and take the facts, together with all reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.'" Pugsley v. Police Dept. of Boston, 472 Mass. 367, 370-371 (2015), quoting from Bulwer v. Mount Auburn Hosp., 86 Mass. App. Ct. 316, 318 (2014), S.C., 473 Mass. 672 (2016). Here, where the Commonwealth is immune from suit for "any claim based on an act or failure to act to prevent or diminish the harmful

_____

[9] The plaintiff does not argue that the hospital was negligent in its assessment of the male patient's risk of violence.

consequences of a condition or situation, <u>including the violent or tortious conduct of a third person</u>, which is not originally caused by the public employer or any other person acting on behalf of the public employer," the defendant bore the burden of demonstrating the absence of a triable issue regarding whether the plaintiff's rape and resulting pregnancy were "originally caused by the public employer" (emphasis supplied). G. L. c. 258, § 10(<u>j</u>). Alternatively, it bore the burden of showing that proof that the public employer "committed an affirmative act that was the original cause of the injury" would not be forthcoming. <u>Audette</u> v. <u>Commonwealth</u>, 63 Mass. App. Ct. 727, 732 (2005). See <u>Kourouvacilis</u> v. <u>General Motors Corp</u>., 410 Mass. 706, 714 (1991) ("[A] party who moves for summary judgment has the burden of initially showing that there is an absence of evidence to support the case of the nonmoving party shouldering the burden of proof at trial").

In this context, "originally caused" means an affirmative act that creates the circumstance which results in the harm inflicted by the third party. See <u>Brum</u> v. <u>Dartmouth</u>, 428 Mass. 684, 693 (1999); <u>Kent</u> v. <u>Commonwealth</u>, 437 Mass. 312, 318 (2002); <u>Gennari</u> v. <u>Reading Pub. Schs</u>., 77 Mass. App. Ct. 762, 764 (2010). The requirement of an "affirmative act" is strict; it is also quite distinct from a failure to prevent the harm. See <u>Kent</u> v. <u>Commonwealth</u>, <u>supra</u> (where the court reiterated that

the "original cause" language had been construed "to mean an affirmative act [not a failure to act] by a public employer that creates the 'condition or situation' that results in harm inflicted by a third party").  See also Brum v. Dartmouth, 428 Mass. at 696 ("[T]o interpret . . . the subordinate clause referring to 'originally caused' conditions, to include conditions that are, in effect, failures to prevent harm, would undermine that principal purpose [of § 10(j)]").  The facts of these two cases, and several others, demonstrate the significant difference between the failure to act and an "original cause."

In Brum, a school principal was told that three men were coming to attack three particular students, but neither he nor any other school official instituted any precautionary measures to protect the students or to prevent the attackers' entry onto the school premises.  Id. at 686-687.  The assailants arrived at the school visibly armed, proceeded to a second-floor classroom unimpeded by school officials, and fatally stabbed one of the identified students; his mother brought suit.  Id. at 687.  In that case, the Supreme Judicial Court held that the principal's failure to institute any safety precautions on behalf of the student was a failure to prevent the harm and not an affirmative act and, consequently, that it was not an original cause of the condition or situation that lead to the student's death.  Id. at 696.  This distinction between a failure to act and an original

cause was further explored by this court in Jacome v. Commonwealth, 56 Mass. App. Ct. 486, 489-490 (2002).

In Jacome, a teenager drowned at a public beach when lifeguards left their posts early. Id. at 488. Despite the dangerous bathing conditions, the beach remained open and no warning signs had been posted. The court held that, under § 10(j), the Commonwealth's negligent failure to prevent the harm did not constitute an original cause of the swimmer's drowning. The court noted specifically that, "[h]ad the public employees acted differently, e.g., had the beach been closed, had conspicuous warning signs been posted, had lifeguards remained on duty until 6:00 P.M., it is possible that the tragedy might have been averted. But the very statement of these possibilities demonstrates why th[e] claim is barred by § 10(j). They are all examples of ways in which the public employees might have prevented the harm to [the deceased teenage swimmer], and consequently they fall within the immunity from suit in such circumstances that the Legislature has preserved." Id. at 490.

Similarly, in Pallazola v. Foxborough, 418 Mass. 639, 639-640 (1994), a man was seriously injured on a public way when he was struck by a goal post that had become electrified when fans attending a sporting event removed the post and caused it to come into contact with a high-voltage overhead electric power

line.  Although the plaintiff recovered a jury award against the town based upon the town's failure to provide sufficient police protection and prevent the unlawful removal of the goal post from the stadium, the court held that § 10(j) barred the plaintiff's recovery and reversed the judgment.  Id. at 641-642.  In Serrell v. Franklin County, 47 Mass. App. Ct. 400 (1999), the plaintiff, a visitor at a house of correction, was inadvertently injured after correctional officers intervened in a fight between an inmate and another visitor.  Id. at 400-401.  We held that, "[t]o the extent that [the plaintiff] seeks to hold the county liable for the correctional officers' failure to prevent the violent outburst of [an] inmate . . . , Brum makes clear that she may not do so."[10]  Id. at 403.

Here, the plaintiff alleges that by allowing access to the recreation room to both males and females, the hospital is an original cause of her rape, pregnancy, and miscarriage.  While we agree with the dissent that "[t]he Commonwealth bears a

_____

[10] In Serrell, 47 Mass. App. Ct. at 401-403, 405, we also concluded that § 10(b) and (j) precluded recovery under several of the plaintiff's theories, including the Commonwealth's "failure to provide a safe area in which to visit an inmate; . . . failure properly to train, instruct and supervise correctional officers; [and] the correctional officers' failure to monitor the inmates in the visiting area and thereby control and ameliorate an increasingly volatile situation," but that § 10(j) did not bar recovery based on a theory of negligent intervention, where the officers' own actions inadvertently caused harm to the plaintiff.

special responsibility for the safety and general well-being of those who have been involuntarily committed to State psychiatric facilities," post at    , we do not think it a fair inference that by merely allowing both men and women access to a common recreation room, the hospital was an original cause of the plaintiff's rape and, therefore, of the injuries, including the plaintiff's pregnancy and miscarriage, which flowed therefrom. See, e.g., Kent v. Commonwealth, 437 Mass. at 319-320 (where the Commonwealth did not create the condition that resulted in the victim's shooting by a parolee, § 10[j] barred suit). Indeed, the Supreme Judicial Court has refused to "adopt an interpretation of [§ 10(j)] that construes the words 'originally caused' so broadly as to encompass the remotest causation and preclude immunity in nearly all circumstances." Brum, 428 Mass. at 695.

In Kent v. Commonwealth, 437 Mass. at 313, the Supreme Judicial Court addressed an analogous situation. There, a police officer was shot and seriously wounded by a convicted murderer who had been paroled years earlier. The officer argued that the parole board's decision to parole his assailant was an original cause of his injury. Id. at 318. The court disagreed. It reasoned that while "[t]here can be little doubt that the [earlier] parole decision contributed in some measure to [the shooter's] freedom [years later], at least in the sense that the

parole board released him from State confinement when he might otherwise still be serving his life sentence," that act did not "materially contribute[]" to creating the specific condition or situation that resulted in harm. Id. at 318, 319. The same is true here.

There can be no question that not every man is a rapist or at risk of a sexual offense, and it is undisputed that the hospital checks its patients' criminal and sexual offending history before admitting them, and that it did so in this case. The hospital made a reasoned decision, which is not at issue here, that the male patient posed no risk of sexual assault. The male perpetrator also did not "appear[] to require strict security," as indicated by his not having been committed to the Bridgewater State Hospital pursuant to G. L. c. 123, § 15(b), and the hospital here had no role in committing him to its care. See, e.g., Brum v. Dartmouth, 428 Mass. at 689 (because the decision to release a prisoner on bail rests with the court, the prosecutor's recommendation for release was too remote to serve as a source of liability for the prisoner's attack on another). Furthermore, hospital staff performed safety checks in the room every thirty minutes, and nothing in the summary judgment record supports an inference that the recreation room itself made the

occurrence of a rape more foreseeable.[11]  Contrast <u>Gennari</u> v. <u>Reading Pub. Schs.</u>, 77 Mass. App. Ct. at 764-765 (that children would run and push each other during a mandated recess session was sufficiently foreseeable to overcome § 10[j] immunity, where school principal chose an unsafe play area).  Under these circumstances, the plaintiff's claim "can be characterized only as failure to prevent the assailant from being in a position to attack the plaintiff," which is insufficient to overcome the immunity that § 10(j) provides.  <u>Brum</u> v. <u>Dartmouth</u>, <u>supra</u> at 695.

We have no doubt that "[h]ad the public employees acted differently" in this case by more closely monitoring the recreation and sunroom "it is possible the tragedy might have been averted.  But the very statement of these possibilities demonstrates why this claim is barred by § 10(j)."  <u>Jacome</u> v. <u>Commonwealth</u>, 56 Mass. App. Ct. at 490.  See <u>Bonnie W</u>. v. <u>Commonwealth</u>, 419 Mass. 122, 123, 126 (1994) (the Commonwealth was not liable for a woman's rape on the basis of a parole

---

[11] On this record, there can be no reasonable depiction of the sunroom as a secluded area.  The sunroom was adjacent to the recreation room.  It was open to all patients and monitored by staff every one-half hour.  We also reject any inference that the rape occurred because the plaintiff was in a locked hospital unit wearing only a hospital gown, <u>post</u> at   .

officer's failure to supervise a sexual predator parolee).[12]

"[T]he principal purpose of § 10(j) is to preclude liability for failures to prevent or diminish harm, including harm brought about by the wrongful act of a third party."  Brum v. Dartmouth, supra at 696.  Accordingly, we do not agree with the dissent that the hospital's decision to not segregate by gender its patients' use of the recreation room caused the plaintiff to be raped by another individual.  Nor do we agree that the decision we reach today runs afoul of our reasoning and decision in Devlin v. Commonwealth, 83 Mass. App. Ct. 530 (2013).

In Devlin, we concluded that a treatment center's decision to employ its prison population to work in a treatment facility in which it housed its civilly committed population was an "original cause" of the violent attack sustained by the treatment center's patient.  In that case, the treatment center voluntarily elected to employ convicted inmates serving criminal sentences to work at the location in which it housed its civilly committed population -- a choice that was explicitly forbidden by statute.  Id. at 533-534, citing G. L. c. 123, § 35, fourth par.  Here, the hospital made no analogous decision.  Unlike the

---

[12] By contrast, in Bonnie W., unlike the situation here, the Commonwealth was liable for recommending a sexual offender for work in a setting that gave him access to the victim's house key.  419 Mass. at 126.  Here, the hospital did not provide a known sexual predator with access to the plaintiff.

management choice made in <u>Devlin</u> to comingle a dangerous prison population with a civilly-committed vulnerable population, the hospital here did not comingle two distinctly different committed populations.[13]  For all these reasons, therefore, we

_____

[13] In our view, the legislation referenced by the dissent, which requires segregation of male and female detainees, has no bearing on our case.  First, the dissent has put forth no evidence that the policy decisions that led to these statutes concerned a fear that the mere comingling of genders would result in an increase in the number of rapes at these institutions.  Second, it is noteworthy that each of these statutes pertains to the segregation by gender of potentially dangerous detainees -- either because these individuals are imprisoned convicts, potentially dangerous substance abusers, persons held on bail, or persons awaiting arraignment whose potential for dangerousness has not yet been determined.  See, e.g., G. L. c. 127, § 22 ("Male and female <u>prisoners</u> shall not be put or kept in the same room in a jail or house of correction" [emphasis added]).  See also G. L. c. 123, § 35 (establishing separate commitment facilities for males and females <u>found to be dangerous</u> due to substance abuse disorders); G. L. c. 125, § 16, third par., inserted by St. 1989, c. 664, § 1 ("The department [of correction] shall maintain at the Massachusetts Correctional Institution, Framingham, a separate awaiting trial unit for females" on bail); G. L. c. 127, § 20 (establishing separate reception centers for male and female "<u>prisoners</u>" [emphasis added]); G. L. c. 127, § 21 (permitting classification of prisoners by gender "to promote their . . . safe custody . . . and to secure the separation of male and female <u>prisoners</u>" [emphasis added]); G. L. c. 147, § 20 (if a female is arrested and detained at a police station, commanding officer must summon matron attached to station or, if no matron is so attached, remove the female prisoner to the nearest station with a matron).

The record in this case does not support an inference that the mental health patients committed to the hospital for evaluation and placed on the Hathorne unit posed the same risks of dangerousness as those underlying the enactment of the statutes referenced by the dissent.  There is no evidence that the plaintiff's assailant was being imprisoned to serve a

conclude summary judgment properly entered for the Commonwealth here.

Judgment affirmed.

---

sentence, was being held on bail, or was potentially sexually dangerous.

MASSING, J. (dissenting, with whom Rubin, J., joins).  In general, the Commonwealth is not liable under the Massachusetts Tort Claims Act (MTCA) for torts committed by third parties, even third parties under the supervision of public employers or their employees.  Thus, the Commonwealth cannot be sued for the violent acts of persons at liberty on parole, even though parolees are under the supervision of public employees and their conditional liberty is the result of the decision of public employees.  See Kent v. Commonwealth, 437 Mass. 312, 319 (2002).  Nor is the Commonwealth generally liable for failing to prevent violent acts committed by one inmate against another in a prison, house of correction, or jail.  Contrast Devlin v. Commonwealth, 83 Mass. App. Ct. 530, 535 (2013) (no exemption from liability where convicted inmates were allowed to work in area of State hospital where civilly committed persons were housed and treated).  A narrow exception exists, however, when an act or decision of a public employer "materially contributed to creating the specific 'condition or situation' that resulted in the harm."  Kent, supra at 319, quoting from G. L. c. 258, § 10(j).  In my view, the Tewksbury State Hospital's decision to house both male and female committed patients in the same locked unit, and to allow the patients unsupervised access to the common room, is such an act.  Accordingly, I respectfully dissent.

By its terms, § 10(j) exempts the Commonwealth from liability for "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person," unless it is "originally caused by the public employer or any other person acting on behalf of the public employer." G. L. c. 258, § 10(j), inserted by St. 1993, c. 495, § 57. I recognize that this provision does not permit us to recast every "failure to . . . prevent" the "conduct of a third person" into an affirmative act of the public employer that "originally caused" the "condition or situation" leading to the plaintiff's injury, lest the exception swallow the rule. See Brum v. Dartmouth, 428 Mass. 684, 693 (1999). "What is needed is an example of a condition leading to a harmful consequence, where that condition was originally caused by the public employer but not brought about by the public employer's failure to prevent it." Ibid. This case presents such an example.

I do not contend that the hospital was the sole cause of the plaintiff's alleged rape, or that it can be liable solely for failure to prevent the plaintiff's injury. Rather, the hospital affirmatively acted to house in the same locked unit both men and women who were committed for competency evaluations in connection with criminal charges, and to permit them to have unsupervised contact in a secluded common room. This decision

was an "original cause" of the plaintiff's rape, pregnancy, and miscarriage. The hospital "materially contributed to creating," and did not merely fail to prevent, the condition that resulted in the plaintiff's being attacked in the common room by an involuntarily committed male patient.

Devlin v. Commonwealth, 83 Mass. App. Ct. 530 (2013), governs the case before us. In Devlin, the plaintiff had been civilly committed under G. L. c. 123, § 35, to the Massachusetts addiction center at the Southeastern Correctional Center in Bridgewater to be treated for alcoholism. Id. at 530-531. A criminal convict who was permitted to work in the facility as a "trustee" attacked the plaintiff, resulting in the loss of sight in his left eye. Id. at 531-532. We held that the Commonwealth's "affirmative decision to allow convicted inmates to work in an area where civilly committed individuals were housed and treated" was an "original cause" of the injury. Id. at 535.

Likewise, this court held under § 10(j) that a school principal's decision to require first graders to take recess in an enclosed, concrete courtyard materially contributed to the severe injury that resulted when one pupil pushed over another in the courtyard. Gennari v. Reading Pub. Schs., 77 Mass. App. Ct. 762, 764-765 (2010). See Bonnie W. v. Commonwealth, 419 Mass. 122, 123-126 (1994) (Commonwealth not exempt from

liability for parole officer's recommendation that convicted rapist be hired by trailer park operator in maintenance position that gave him access to the keys of plaintiff's mobile home, which parolee then used to gain access to plaintiff's trailer and sexually assault her);[1] Kent, 437 Mass. at 319 n.9 (discussing Bonnie W. and other cases predating § 10[j] illustrating factual scenarios that could come within the concept of "original cause").

The common thread in these cases is that an affirmative decision by a public employer, not just a failure to act, played a significant role in placing a vulnerable plaintiff in harm's way. Here, as in Devlin and Gennari, the hospital made an affirmative decision to place the female plaintiff and her male assailant in a confined space -- a locked hospital unit -- for criminal competency evaluation, and to give both men and women committed for evaluation access to an isolated, unmonitored common room. While the majority may be correct that the hospital had no choice whom it accepted for evaluation, the hospital did make an affirmative decision to house involuntarily committed men and women together in a locked unit and to permit

---

[1] By contrast, the Commonwealth was not liable for the sexual assault based solely on the same parole officer's failure to supervise the parolee. Bonnie W., 419 Mass. at 126.

common access to the sunroom.[2]  Its decision materially contributed to the situation that resulted in the plaintiff's being in that room, wearing a hospital gown because her only clothes were in the wash, when a male patient raped her.  "The Commonwealth's decision was not so remote from the injury that it can be considered not to have been an original cause."  Devlin, 83 Mass. App. Ct. at 535.

The Commonwealth bears a special responsibility for the safety and general well-being of those who have been involuntarily committed to State psychiatric facilities.  See

---

[2] Although the hospital's decision did not violate any law or regulation, the statutes governing the detention of females generally call for them to be housed in separate facilities from similarly situated males.  See, e.g., G. L. c. 127, § 22 ("Male and female prisoners shall not be put or kept in the same room in a jail or house of correction").  See also G. L. c. 123, § 35 (establishing separate commitment facilities for males and females found to be dangerous due to substance abuse disorders); G. L. c. 125, § 16, third par., inserted by St. 1989, c. 664, § 1 ("The department [of correction] shall maintain at the Massachusetts Correctional Institution, Framingham, a separate awaiting trial unit for females"); G. L. c. 127, § 20 (establishing separate reception centers for male and female prisoners); G. L. c. 127, § 21 (allowing for classification of prisoners by gender "to promote their . . . safe custody . . . and to secure the separation of male and female prisoners"); G. L. c. 127, § 83A (establishing, for male prisoners, camps for employment "in reforestation, maintenance and development of state forests"); G. L. c. 147, § 20 (if a female is arrested and detained at a police station, commanding officer must summon matron attached to station or, if no matron is so attached, remove the female prisoner to the nearest station with a matron).  While these laws may or may not have been enacted to prevent institutional rapes, they certainly reflect a concern that the comingling of genders in locked facilities affirmatively creates health and safety risks.

Brum, 428 Mass. at 699-700, citing DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 199-200 (1989). But even without any special responsibility, the Department of Mental Health employees "owed [the plaintiff] a duty of care, not because they were employed to protect persons such as [the plaintiff] and failed to do so, but because, by taking action that exposed [the plaintiff] to risk, they were bound, as any other person would be, to act reasonably." Onofrio v. Department of Mental Health, 408 Mass. 605, 610 (1990). Under these circumstances, I would conclude as a matter of law that the Commonwealth is not immune from the plaintiff's claim of negligence on the basis of § 10(j).

Accordingly, summary judgment should not have been allowed, and the plaintiff's MTCA claim should proceed to trial. At trial, the plaintiff would have the burden to prove that a rape occurred, see ante at note 4, that the hospital or its employees were negligent, and that their negligence was a proximate cause of her injury. See Harrison v. Mattapoisett, 78 Mass. App. Ct. 367, 372-373 (2010), quoting from Jupin v. Kask, 447 Mass. 141, 146 (2006) ("To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damages

resulted, and that there was a causal relation between the breach of the duty and the damage").[3]

_____

[3] The majority observes that the plaintiff does not argue that the hospital was negligent in assessing her alleged assailant's risk of violence. See ante at note 9. This question is not germane to the applicability of § 10(j). Rather, questions such as whether the hospital reasonably concluded that this particular male patient posed no risk of sexual assault, or whether the hospital adequately supervised the common room, go to the ultimate issue of whether the hospital was negligent.