LYNCH, Chief Judge.
This tragic case arises out of the unwarranted shooting death of a civilian, Miguel A. Cáceres-Cruz, in Puerto Rico by an on-duty police officer, Javier Pagán-Cruz. Plaintiffs, the victim’s surviving wife and children, sued Pagán, his two fellow officers on the scene, and five supervisors under 42 U.S.C. § 1983 for violating the decedent’s Fourth Amendment rights by causing his wrongful death.
*12 The supervisors initially moved to dismiss the claims against them under Fed. R.Civ.P. 12(c); that motion was granted in part and denied in part. See Ramirez-Lluveras v. Pagcm-Cruz, 833 F.Supp.2d 151, 165 (D.P.R.2011). Later, after discovery, the five supervisors successfully moved for summary judgment on the remaining claims against them. See Ramirez-Lluveras v. Pagan-Cruz, 833 F.Supp.2d 165, 182 (D.P.R.2011). Afterward, the plaintiffs prevailed at trial against the defendants Pagán and the two other on-scene officers, Carlos Sustache-Sustache and Zulma Díaz. The jury awarded the plaintiffs approximately $11.5 million.
The case now reaches us on two appeals: the plaintiffs’ appeal from the district court’s grant of summary judgment in favor of the supervisory defendants (No. 13-1169) and the supervisory defendants’ appeal from the district court’s earlier denial of their Rule 12(c) motion (No. 11-2339). We affirm the grant of summary judgment against plaintiffs’ supervisory liability claims against each of the supervisors. We dismiss the Commonwealth’s appeal from the earlier partial denial of the Rule 12(c) motion as to these same defendants.
I.
We briefly describe the procedural history before turning to the facts of the case. On April 28, 2008, the plaintiffs filed suit under § 1983 against Pagán and his two on-scene colleagues, Officers Carlos Sus-tache-Sustache and Zulma Diaz (collectively, the line officers), and against Col. Edwin Rivera-Merced, the Puerto Rico Police Department (PRPD) Area Commander for Humacao, as their supervisor. On March 30, 2009, the plaintiffs amended their complaint to add the four other supervisory officers as defendants. However, none of the claims against any of the supervisory defendants arose from any direct supervision of Pagán on the night of the shooting or from any personal involvement of the supervisors with the shooting. The supervisory defendants answered the amended complaint and set forth a list of forty-one affirmative defenses, including qualified immunity.
On April 20, 2010, the supervisory defendants filed a “Motion to Dismiss Amended Complaint and/or for Judgment on the Pleadings” under Rules 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure.[1]
The district court granted the motion in part and denied it in part on September 30, 2011. Specifically, the court dismissed all of the plaintiffs’ § 1983 claims, including the Fourth Amendment claims, against the supervisory defendants brought in the plaintiffs’ own individual capacities, as opposed to their capacities as representatives of the victim. It did so based on its finding that the plaintiffs lacked standing to assert individual claims because there was no allegation that the supervisors’ conduct was aimed at the family relationship. The court dismissed all claims under the Fourteenth Amendment. It also granted the motion as to other claims against the supervisory defendants in the plaintiffs’ representative capacities. It allowed the § 1983 Fourth Amendment claims against the supervisory defendants to proceed, declining to resolve their qualified immunity defense on the pleadings.[2] The plaintiffs *13 did not appeal the dismissal of these claims in the plaintiffs’ individual capacities against the supervisors. The supervisory defendants appealed from the denial of their motion to dismiss as to the Fourth Amendment § 1983 claims against them.[3]
On December 22, 2011, the district court granted the supervisory defendants’ motion for summary judgment. This left the claims against the line officers, Pagán, Sustache, and Díaz.
The claims against the line officers went to trial before a jury in late October 2012. On November 9, 2012, the jury reached a verdict in favor of the plaintiffs against all three line officers. After entry of final judgment, the plaintiffs appealed the grant of summary judgment in favor of the supervisory defendants.[4] The two appeals were consolidated.
II.
The following facts are undisputed, except where noted. To the extent the facts are disputed, we take them in the light most favorable to the plaintiffs for purposes of the supervisory defendants’ motion for summary judgment. See Pineda v. Toomey, 533 F.3d 50, 53 (1st Cir.2008).
A. The August 11, 2007 Shooting
Miguel A. Cáceres-Cruz (“Cáceres”), the victim, was a member of the Punta Santiago Scooter Club. On the evening of August 11, 2007, around 6:10 p.m., roughly eleven members of the Club brought their scooters to a house for a quinceañero[5] at which they were to serve as an escort for the fifteen-year-old birthday girl. With the scooters parked on the street, two-way traffic was obstructed, so Cáceres helped direct cars around the parked scooters.
One of the cars caught in the traffic was a PRPD Ford Explorer in which officers Pagán, Sustache, and Díaz were riding. The officers were not assigned to a patrol in this area, Punta Santiago, but instead were passing through on their way to a different area, Naguabo, to which they were assigned to combat drug trafficking. They did not have any directions to engage in any actions in Punta Santiago. In fact, the officers passed through Punta Santiago only because they chose to take a different route to Naguabo than they had been instructed to take after picking up Officer Diaz, who had been late for her shift.
When Pagán reached Cáceres’s position, he told Cáceres that only the police have the authority to direct traffic. He also ordered the club members to move their scooters off the road within five minutes. What happened next is not entirely clear, although both parties agree with the general outlines. There is a dispute over whether the club members actually began *14 moving their scooters. The parties agree that Pagán and Cáeeres began exchanging insults and that at some point in the exchange, Diaz told Cáeeres that he was under arrest. A video of the incident shows the three officers separating Cá-ceres from his fellow club members. A fight broke out. The parties dispute who initiated the physical contact, but they agree that, at some point, Cáeeres resisted, hitting both Díaz and Pagán. Eventually, either the officers drove Cáeeres to the ground or he stumbled to the ground after being hit. Pagán punched Cáeeres in the face while Cáeeres was on the ground. Cáeeres had been driven to a seated position on the ground with his back against a fence. As he sat, he was straddled by Pagán and surrounded by the other two officers.
From the ground, Cáeeres reached up and touched Pagán’s gun holster; the parties dispute whether he was simply reaching for Pagán’s leg while he was trying to stand or whether he was continuing the fight. Pagán placed his hand on top of Cáceres’s and the two struggled over the gun. Eventually, the gun, still holstered on Pagán, went off and shot Pagán in his leg. Pagán pulled away from Cáeeres, who slumped from a sitting position to lying with his stomach on the ground. While Cáeeres was still on the ground, Pagán drew his gun and shot Cáeeres multiple times in the back. After a pause, Pagán shot Cáeeres one final time, this time in the head, administering a coup de grace. Cáeeres died from the shooting. He was 43 years old at the time. Pagán was 33 years old, and a 13-year veteran of the PRPD.
The officers retreated to their car and left the scene. Diaz then used the police radio to inform a dispatcher that Pagán was bleeding profusely. She did not mention the shooting of Cáeeres.
There are later events which the plaintiffs discuss at length as evidence of an alleged cover-up of the shooting. Specifically, the plaintiffs explain that some of the supervisory defendants represented to the media that Pagán had clearly been acting to defend himself against Cáceres’s unprovoked aggression. However, the plaintiffs do not explain how any alleged cover-up after the shooting would be relevant to their claims, which are based on a wrongful death theory, since any alleged coverup would have occurred after Cáeeres had already died. We do not discuss the cover-up theory. Pagan was dismissed from the PRPD on June 4, 2008.
B. Pagán’s Disciplinary History
The plaintiffs’ theories of liability against the supervisory defendants rely heavily on the proposition that Pagán’s disciplinary history provided adequate warning to his supervisors that he was at substantial risk of committing an unjustified shooting of an arrestee as an armed officer, and that the supervisors were deliberately indifferent to this risk. The plaintiffs then assert theories that various policies and procedures interfered with the defendants’ taking appropriate actions on those risks.
Pagán had been the subject of seven disciplinary complaints before the August 11, 2007 shooting. The first complaint, in 1998, was for theft of government property (which he had left in the trunk of his personal vehicle), for which he received a warning.
The second complaint, and of most significance to this case, was a set of 1999 domestic violence allegations described in the official record as follows: “The complainant alleged that after [complainant] entered into a romantic relationship with [Pagán] he attacked her because he saw her talking with another officer and he *15 threatened her with his regulation firearm.” The PRPD’s initial investigation of these allegations started immediately and ran through 2004. In 2004, the PRPD Superintendent released an initial disciplinary recommendation for termination of Pagán’s employment. After a hearing in which Pagán denied the allegations, the Superintendent in May 2006 instead ordered discipline of 60 days’ suspension from employment without pay. Pagán served that discipline between August and October of 2006.
The third complaint was a 1999 insubordination charge, which was pending at the time Pagán was dismissed from the PRPD after the August 11, 2007 shooting and was filed for future reference as a result. A fourth complaint was filed in 2002 for Pa-gán’s failure to appear in a local court after being subpoenaed. Later in 2002, there was a fifth complaint about reporting a “loss” in a stolen and recovered vehicle report. Sixth, in 2003, Pagán was charged with failing to take action on a complaint "filed by a citizen; the charge was filed in the record. Finally, in 2004, there was a complaint for assaulting a motorcyclist, about which there are no other details in the record. The charge was also filed in the record.
We return to the domestic violence complaint, which was considered “substantiated” after the initial investigation, and on which the plaintiffs’ case largely rests. The domestic violence complaint was based on three incidents beginning in August 1998 involving Pagán’s then-girlfriend: (1) in August 1998, after Pagán saw his girlfriend speaking with another police officer, the girlfriend alleged that Pagán slapped her, pointed his official firearm at her, and threatened to kill her if he saw her with another man; (2) later, the girlfriend also alleged that after she and Pagán had broken up and she sent Pagán a bill for a beeper she had bought him as a gift, he “burst” into her home and told her, “Who the hell asked you to send the beeper and the bill with Officer Sammy Torres,” which upset her; and (3) later, the girlfriend added the claim that at some earlier time in 1998, Pagán had stored in her home an arrestee’s firearm for three days before removing it and taking it to the Firearms Division, and that he “swore that he was going to kill the arrestee.” (Pagán did not kill the arrestee, nor did he take any steps toward doing so.)
The PRPD promptly investigated the girlfriend’s complaint. On the same day the complaint was filed, the supervisor on duty interviewed the complainant, went to the District Attorney, who decided there was no basis to file criminal charges against Pagán, and notified the PRPD Juncos District Commander of the administrative complaint. Two days later, a memo was sent from the Juncos District Commander to the Humacao Area Commander submitting the domestic violence complaint for consideration. It described the complaint as follows:
The claimant alleges that she had an intimate consensual relationship with [Pagán] for several months. That, during the month of August and on September 29, 1998, she was psychologically and verbally abused through threats made by the same, which would make her worry.
The memo repeated that the District Attorney had declined to file charges since he believed no domestic violence in violation of Puerto Rico law had been committed. The memo also stated that Pagán’s police-issued firearm had been seized and he had been referred to the Domestic Violence Division in compliance with PRPD guidelines.
As to the Domestic Violence Division, on December 17, 1998, the Director of the *16 Domestic Violence Division asked that Dr. Aida Myrna Vélez of the Psychology and Social Work Division give priority to a psychological evaluation of Pagán, referencing an earlier request which had been made on October 19, 1998. There is no evidence that the psychological evaluation produced any indication that Pagan was thought to pose a risk to others.
As of August 2000, the PRPD conducted a formal administrative investigation into the domestic abuse charges. Sgt. José Berrios Diaz documented his investigation in an August 23, 2000 memo to the Assistant Superintendent responsible for administrative investigations. The memo characterized the complainant as being the “victim of verbal and psychological abuse through threats made by [Pagán].” Evelyn Velázquez, a friend of the complainant, was interviewed and stated Pagán had “verbally insulted” the complainant and had threatened the complainant with death, but that the complainant had never told her that Pagán ever “physically assaulted her.” Velázquez also confirmed that Charlie, the arrestee whose gun had been kept temporarily at the complainant’s house, had made threats against Pagán. Velázquez also said that while with Pagán and the complainant, Velázquez had once “playfully” taken Pagan’s gun and pointed it him, “also playfully,” so that he “would learn” what his girlfriend felt when he had threatened her.
The report stated that “Pagán was interviewed and stated that what was being said was not true.” The investigative report concluded that Pagán had committed four serious violations of PRPD standards of conduct.[6]
Based upon this report, then-Superintendent Agustín Cartagena Diaz wrote to Pagán on August 30, 2004, informing him of the results of the investigation. Based on the girlfriend’s allegations, the letter expressed an intent to expel Pagán from the PRPD. The letter notified Pagán of his right to a hearing on the issue.
Pagán requested a hearing, which was held on October 8, 2005. After the hearing, an Associate Police Superintendent, signing on behalf of Police Superintendent Pedro Toledo-Dávila, informed Pagán by a letter dated May 18, 2006 that the proposed expulsion would be converted to a 60-day suspension without pay. Importantly, the May 18, 2006 letter stated: “After evaluating the record we have determined that the sanction announced in the Resolution of Charges must be modified. In consequence I suspend you from employment and pay for the term of sixty (60) days effective on the date of notification for this communication” (emphasis added).
Pagán apparently did not appeal that decision. Pagan served the suspension without pay between August and October 2006. This was eight years after the underlying domestic abuse events had occurred. It was one year before the shooting. There were no other domestic violence charges aside from those arising out of the events in 1998.
*17 On November 4, 2004, Pagán was reassigned by the Humacao Area Commander to the Special Response Team of the Tactical Operations Division (TOD), an “elite unit” trained “to deal with sensitive situations.”
C. The Identity and Role of the Supervisory Defendants
The plaintiffs originally sued Col. Edwin Rivera-Merced, Humacao Area Commander, as the supervisor of the three line officers. The plaintiffs later added another four supervisors at various levels in the Puerto Rico police department: Superintendent Pedro Toledo-Dávila, Lt. Victor Cruz-Sánchez, Sgt. Rafael Figueroa-Solis, and Sgt. Juan Colón-Báez.
On the date of the shooting in August 2007, the chain of command above Pagán was as follows. Sgt. Colón-Báez was serving as Acting Director of the TOD while Sgt. Figueroa-Solis, its regular Acting Director at the time, was on vacation. In that temporary position, Sgt. Colón-Báez had Pagán and another thirty or so officers in the TOD under his supervision. Sgt. Colón-Báez was in turn supervised by Lt. Cruz-Sánchez, the officer in charge of the Humacao area. He reported to Col. Rivera-Merced, the Humacao Area Commander who oversaw 400 to 500 officers, and Col. Rivera-Merced reported to Superintendent Toledo-Dávila, who was the highest ranking officer in the entire PRPD.
1. Superintendent Toledo-Dávila
Toledo-Dávila, now deceased, was the Police Superintendent of the PRPD at the time of the shooting, serving from 1993 to 2000 and again from 2005 to 2008. This is the highest position in the PRPD, which had thousands of officers in its service.
The plaintiffs alleged that Superintendent Toledo-Dávila instituted policies making it difficult for lower-level supervisors to become aware of officers’ offenses by removing the facts about the offenses from their disciplinary memoranda. As to personal supervisory involvement with Pagán, Toledo-Dávila was the superintendent who set Pagán’s sanction for the domestic violence complaint at a 60-day suspension in 2006 after the hearing, a lighter punishment than the initial pre-hearing recommendation of expulsion. Superintendent Toledo-Dávila is not alleged to have had any direct involvement with, or even direct supervisory responsibility over, Pagán’s actions on August 11, 2007.
2. Col. Rivera-Merced
Col. Rivera-Merced was the Area Commander of the Humacao area, which is where Pagán served on the day of the shooting. In that role, Col. Rivera-Merced oversaw about 400 to 500 police officers. The plaintiffs claim that Col. Rivera-Merced knew about Pagán’s 2006 suspension because he had personally “processed” it, and that he was responsible for assigning Pagán to the TOD. Col. Rivera-Merced also had the authority to refer officers under him to counseling and to receive fitness-for-duty recommendations. The plaintiffs’ primary allegation against Col. Rivera-Merced is that upon Pagán’s return from the 2006 suspension, he immediately placed Pagán back into the “elite” TOD without meaningfully considering Pa-gán’s fitness for that unit.[7] The plaintiffs also argue that Col. Rivera-Merced failed to assign an adequate number of supervisors to the TOD. There is no claim that *18 Col. Rivera-Merced had directly supervised Pagán on the day of the shooting; indeed, there were several layers of supervisory personnel between Col. Rivera-Merced and Pagán, and Rivera-Merced was not on duty on August 11, 2007.
3. Lt. Cruz-Sánchez
Lt. Cruz-Sánchez was the Director of the TOD in Humacao through March 2007, when he was elevated to Commander of the Humacao precinct. In his role as TOD Director, Lt. Cruz-Sánchez oversaw about 30 officers. Lt. Cruz-Sánchez evaluated Pagán a few months after his return from the suspension and “gave him glowing ratings.” These high ratings may have been given in part because he gave all of his subordinates high ratings and pro forma evaluations.
The plaintiffs allege Lt. Cruz-Sánchez was directly responsible for selecting line officer Diaz for the TOD and did so without reviewing her personnel file. But there is no claim that had he reviewed the file, Lt. Cruz-Sánchez would have had reason to believe Officer Diaz would pose a substantial risk to civilians; moreover, Diaz was not the shooter. Lt. Cruz-Sán-chez also had direct knowledge of Pagán’s suspension but did not know its cause; he later testified that he thought Pagán had been suspended for mishandling an investigation. There is no claim that Lt. Cruz-Sánchez was directly supervising Pagán at the time of the shooting.
4. Sgt. Figueroa-Solis
Sgt. Figueroa-Solis was a supervisor in the TOD and was promoted to Acting Director in March 2007 after Lt. Cruz — Sán-chez’s promotion to precinct commander. There were no other ranked supervisors in the TOD while Sgt. Figueroa-Solis was Acting Director. Sgt. Figueroa-Solis went on vacation in July and August 2007 and was out of town on the date of the shooting; during that time, Sgt. Colón-Báez served as Acting Director. The plaintiffs allege that Sgt. Figueroa-Solis did not review the disciplinary files of his subordinates — arguably against department requirements, although his status as “Acting” Director makes the precise requirement unclear. He also did not review Pagán’s record when Pagán entered the TOD; the plaintiffs allege it is reasonably clear that he would have been expected to do so to make sure that the new officer was fit for the assignment. Sgt. Figueroa-Solis was the individual who notified Pagán about his proposed expulsion in 2004, but he was not familiar with the complaint underlying the proposal. He was also responsible along with Sgt. Colón-Báez for choosing Sustache and Pagán for the Impact Unit within the TOD. Because he was on vacation on August 11, 2007, Sgt. Figueroa-Solis was not directly supervising Pagán at the time of the shooting.

5.Sgt. Colótu-Báez

Finally, Sgt. Colón-Báez was Lt. Cruz-Sánchez’s assistant while the latter was director of the TOD. He remained Lt. Cruz-Sánchez’s assistant upon Lt. Cruz-Sánchez’s promotion to precinct commander in early 2007, but returned to the TOD as Acting Director while Sgt. Figueroa-Solis was on vacation in July and August of 2007. He shared responsibility with Sgt. Figueroa-Solis for placing Sustache and Pagán on the Impact Unit. Sgt. Co-lón-Báez was the person who actually served Pagán with his suspension notice in 2006. He was aware that the suspension was related to domestic violence but made no further inquiries.[8] Sgt. Colón-Báez *19 was Pagán’s direct superior on the night following the shooting, but he had no direct involvement with the actual events leading up to the shooting, nor did he give any assignments to Pagán leading to the shooting. In fact, Sgt. Colón-Báez was on his day off on August 11, 2007.
III.
We begin with the plaintiffs’ appeal of the grant of summary judgment in favor of the supervisory defendants. We review the district court’s grant of summary judgment de novo, reading the facts and drawing all inferences in the light most favorable to the plaintiffs. See Pineda v. Toomey, 533 F.3d 50, 53 (1st Cir.2008). Summary judgment is proper if there is no genuine dispute of material fact and the defendants are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).
A. Supervisory Liability Under § 1983
The defendants strongly urge that this case be used as a vehicle to recast the contours of supervisory liability in the aftermath of Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). We see no reason to do so or to address what is a hypothetical argument. The plaintiffs’ case against the supervisors simply is insufficient to meet this circuit’s standards as articulated before and reinforced after Iqbal.
There are a number of clear rules governing supervisory liability under § 1983. First, the subordinate’s behavior must have caused a constitutional violation, although that alone is not sufficient. See, e.g., Welch v. Ciampa, 542 F.3d 927, 937 (1st Cir.2008); Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.1996). Here, there is a jury verdict establishing Pagán’s and the other two officers’ violation of constitutional rights.
Additionally, the tort theory of respondeat superior does not allow imposition of supervisory liability under § 1983. See, e.g., Grajales v. P.R. Ports Auth., 682 F.3d 40, 47 (1st Cir.2012). Proof that the supervisors were negligent is also insufficient. See, e.g., Ramos v. Patnaude, 640 F.3d 485, 490 (1st Cir.2011); Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 92 (1st Cir.1994) (“[A] supervisor cannot be [held] liable for merely negligent acts.”). Further, § 1983 liability cannot rest solely on a defendant’s position of authority. Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 16 (1st Cir.2011) (citing Ayala-Rodriguez v. Rullán, 511 F.3d 232, 236 (1st Cir.2007)).
After Iqbal, as before, we have stressed the importance of showing a strong causal connection between the supervisor’s conduct and the constitutional violation. See Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir.2011) (“[A] supervisor may not be held liable for the constitutional violations committed by his or her subordinates, unless there is an affirmative link between the behavior of a subordinate and the action or inaction of the supervisor ... such that the supervisor’s conduct led inexorably to the constitutional violation.” (alterations in original) (quoting Soto-Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir.2011)) (internal quotation marks omitted)). The showing of causation must be a strong one, as that requirement “contemplates proof that the supervisor’s conduct led inexorably to the constitutional violation.” Hegarty v. Som *20 erset Cnty., 53 F.3d 1367, 1380 (1st Cir.1995) (emphasis added).
In addition, the supervisor must have notice of the unconstitutional condition said to lead to the claim. Feliciano-Hernández, 663 F.3d at 533 (“[T]he plaintiff must show that the official had actual or constructive notice of the constitutional violation.” (quoting Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 768 (1st Cir.2010)) (internal quotation marks omitted)); id. at 535 (“Actual or constructive knowledge of a rights violation is a prerequisite for stating any claim.”).
A plaintiff may prove causation by showing a “known history of widespread abuse sufficient to alert a supervisor to ongoing violations.” Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir.1994). However, proof of that sort must truly show “widespread” abuse; “isolated instances of unconstitutional activity ordinarily are insufficient ... to show deliberate indifference.” Id.
Turning from causation to what it means to be deliberately indifferent, we have typically formulated the deliberate indifference inquiry as a three-part test that requires plaintiffs to show: (1) “that the officials had knowledge of facts,” from which (2) “the official[s] can draw the inference” (3) “that a substantial risk of serious harm exists.” Ruiz-Rosa v. Rullán, 485 F.3d 150, 157 (1st Cir.2007) (alteration in original) (quoting Calderon-Ortiz v. LaBoy-Alvarado, 300 F.3d 60, 65 (1st Cir.2002)) (internal quotation marks omitted); see also Bowen v. City of Manchester, 966 F.2d 13, 17 (1st Cir.1992).
B. Application of Supervisory Liability Standards
The strongest of the plaintiffs’ arguments [9] depends on the theory that Pa-gán’s disciplinary record, especially as to the substantiated complaints of domestic violence, should have led the supervisory defendants to have knowledge of facts from which they would have inferred that Pagan posed a substantial risk of doing serious harm to others. This should have prompted them to take action, other than what they did do, to prevent such harm. The plaintiffs also build on this central claim by alleging that various defendants were deliberately indifferent to the PRPD’s inadequate procedures for reviewing and disseminating disciplinary records. If Pagán’s disciplinary record was insufficient on causation — that is, if it was not sufficient to put the supervisory defendants on notice of substantial risk of serious harm to others- — then these allegations about inadequate procedures are beside the point.
The plaintiffs also make some weak claims unrelated to Pagán’s disciplinary record. They allege there were insufficient procedures for reviewing officer-involved shootings. But, as the plaintiffs’ expert explained, neither Pagán nor the two other officers at the scene had shot anyone before and so the causal link fails. *21 To the extent the plaintiffs show there was an unrelated shooting elsewhere that Pa-gán had witnessed roughly a week before, there was no causal relationship to Pagán’s shooting in entirely different circumstances on August 11, 2007.
1. Claimed Deliberate Indifference to Pagan’s Disciplinary Record
Pagán’s disciplinary record evidenced seven instances of alleged misconduct over a nearly fourteen-year period. That record was not sufficient to put supervisors on notice that he presented a “substantial,” “unusually serious,” or “grave risk” of shooting an arrestee. See Ruiz-Rosa, 485 F.3d at 157; Figueroa-Torres v. Toledo-Dávila, 232 F.3d 270, 279 (1st Cir.2000); Bowen, 966 F.2d at 17; accord Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir.1998). Nor did it give notice he required discipline beyond that already given to him.
We do not discount the seriousness of the domestic violence allegations. We think the commission of these acts by Pa-gán against his girlfriend is indeed relevant to whether Pagán could be thought to pose a threat of violence to others when he was on official duty. We disagree with the proposition that private domestic abuse is not relevant to the risk of an officer abusing his public position with violence. Nonetheless, in light of all of the facts here, the causal connection the plaintiffs attempt to draw is insufficient as a matter of law to impose supervisory liability even on those supervisors who knew of the content of Pagán’s disciplinary record, much less on those who did not know.
The domestic abuse events took place in 1998, nearly nine years before the shooting. The complaint about them was handled seriously by the PRPD. The PRPD investigation found that Pagán had made verbal threats and made threats using his weapon, but did not find he had acted on those threats or inflicted physical harm on others, much less used his weapon to shoot anyone. Further, Pagan was promptly sent for evaluation by the Domestic Violence unit, his firearm was taken away, and he was suspended. Once Pagán and the complainant’s relationship ended, there were no other domestic abuse complaints filed against Pagán. Importantly, while Toledo-Dávila had recommended termination based only on the pre-hearing allegations, that recommendation was not deemed suitable after Pagán was given a hearing. Indeed, Toledo-Dávila said the evidence at the hearing compelled that reduction of the discipline to a suspension for a period of time. Pagán did receive significant discipline after the hearing: a sixty-day suspension without pay. A reasonable official would think that suspension would have a deterrent effect. Indeed, the handling of the charges in a serious manner seemed to have that effect, for there were no other domestic abuse claims made against Pagán after the charges were brought. This evidence is simply insufficient to show the needed causal relationship between the 1998 domestic abuse complaint and the August 11, 2007 shooting. Even after thoroughly investigating the complaint, the PRPD Superintendent did not conclude that the events showed that Pagán was too dangerous to be in a position in which he would encounter civilians. The record does not evidence any causal link between the two events.
Only a single other item in Pagán’s record' — -a complaint about assaulting a motorcyclist in 2004 — revealed any additional potential tendency of violence toward civilians.[10] But the record does not show that *22 this complaint was substantiated in anyway, nor does it give any information about the contents of the complaint.
These instances simply do not rise to the level of a “substantial” or “unusually serious” risk of shooting a civilian that the case law demands. Cf. Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 49 (1st Cir.1999) (finding deliberate indifference to grave risk of violence based on disciplinary record including thirty incidents of abuse of power, unlawful use of force, or physical assault, with six incidents generating recommendations of expulsion). In contrast to the grave risk presented in Barreto-Riv-era, the disciplinary record here showed no prior incidents of Pagán’s assaulting arrestees or shooting his weapon unjustifiably, across more than a decade of Pagan’s police service. Without such a record, the supervisory defendants cannot be said to have ignored a grave risk of harm.[11] The remaining theories of liability largely depend on the assertions that the supervisory defendants’ failure to take action based on Pagán’s disciplinary record met the causation requirement, which we have rejected.
2. Insufficient Procedures for Reviewing Disciplinary Records
The plaintiffs next argue that Sgt. Figueroa-Solis’s failure to review Pagán’s record at the time Pagán joined the TOD was causally related to the shooting, that lower-level supervisors frequently failed to review disciplinary records at the relevant times, and that the records did not contain enough information to allow lower-level supervisors to meaningfully review their subordinates’ records.[12]
These alleged errors plainly fail on the causation prong, and so we need not decide whether this theory is actually one of a constitutional violation. Even if Sgt. Figueroa-Solis had reviewed Pagán’s file at the appropriate time, the file would not have demonstrated that Pagán had a proclivity for violence or was unfit for duty. It is true that a policy change instituted by Toledo-Dávila removed the details of the offense from the file memoranda imposing *23 the disciplinary measures. But this policy change itself creates no liability with respect to Toledo-Dávila. That argument, which the plaintiffs have not substantially developed, fails on the substantial risk prong. The plaintiffs have produced no evidence to show that this policy created a substantial risk of subordinate officers’ violating the constitutional rights of arres-tees.
The plaintiffs argue that the PRPD’s failure to punish seriously Pagán’s past disciplinary violations amounted to supervisory condonation of his practices. But there is no showing he posed a substantial risk, much less that his suspension was inadequate to the offense. The plaintiffs’ argument also fails because it depends on the inference that insufficient sanctioning for past problems led Pagán to believe that he could get away with more bad acts-literally, murder. Under Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87 (1st Cir.1994), that argument cannot save the plaintiffs’ case. See id. at 94 (explaining that it is “simply too tenuous” to draw an inference that “because Officer Rodriguez had not been sanctioned with respect to [his past] five [disciplinary] incidents, he believed he could get away with anything, including assaulting Febus”). More direct proof of causation is needed, and the record provides none.
3. Insufficient Procedures for Reviewing Officer-Involved Shootings
The plaintiffs next argue that the supervisory defendants did not ensure that sufficient procedures were in place for reviewing officer-involved shootings. This argument does not turn on Pagán’s personal characteristics but is generic.
The plaintiffs urge us to infer that, had Pagán and his companions known that a meaningful investigation would follow any shooting they might commit, Pagán would have been less likely to shoot Cáceres. The plaintiffs sharpen this theory by arguing that if more had been done about another shooting, which they argue Pagán witnessed, that would have deterred him from shooting Cáceres. On August 5, 2011, the week before Pagán’s shooting of Cáceres, Pagán and Sustache were on duty at a youth festival at which another officer shot a 21-year-old several times, killing him. The plaintiffs allege that Pagán witnessed that shooting but was not interviewed in any subsequent investigation. This theory twice fails: it tries to prove causation using only negligence, and the causal link between that negligence and the Cáceres shooting is entirely speculative. We have already held that such a theory, even on much stronger facts, was “simply too tenuous” to support recovery. Febus-Rodriguez, 14 F.3d at 94.
IV.
We next turn to the supervisory defendants’ appeal of the district court’s denial of their earlier motion to dismiss plaintiffs’ § 1983 claims for qualified immunity.
The summary judgment in defendants’ favor moots the qualified immunity issue. We decline to offer a hypothetical opinion on the qualified immunity issue in this case.
V.
For the foregoing reasons, the district court’s grant of summary judgment, at issue in No. 13-1169, is affirmed. The appeal in No. 11-2339 is dismissed. No costs are awarded.

So ordered.

. For reasons not revealed in the record, neither the court nor plaintiffs reacted to the motion until the supervisory defendants asked the court to grant the motion as unopposed on December 8, 2010. On December 20, 2010, plaintiffs filed an opposition to the motion.

. The district court also denied the motion to dismiss as to plaintiffs’ supplemental negli *13 gence claims under Article 1802 of the Puerto Rico Civil Code. Neither party presents an argument about the Article 1802 claim, so those arguments are waived. See Ortiz v. Gaston Cnty. Dyeing Mach. Co., 277 F.3d 594, 598 (1st Cir.2002).

.Because the supervisory defendants had already prevailed on summary judgment by the time their appeal from the Rule 12(c) decision was processed, we granted plaintiffs' motion to stay that appeal pending the entry of final judgment in the district court.

. The summary judgment decision was not immediately appealable because the case against the line officers remained active. Plaintiffs first asked the district court to certify the summary judgment decision to this court for appeal; that request was denied. Plaintiffs then asked the court to reconsider its summary judgment decision; that motion was also denied.

. A quinceañero is a traditional coming-of-age birthday party thrown for girls as they turn fifteen, with rough similarities to a “sweet sixteen" party.

. The violations were:
Serious Offense # 1: “Show a patent inability, incompetence, carelessness, partiality or negligence in the performance of his or her duties, functions and responsibilities.”
Serious Offense #3: “Leave police-issued firearms or any other firearm carried or possessed under a permit at the reach of other persons who are not authorized to use them or allow others to use them, or failing to take the corresponding measures in relation to them.”
Serious Offense # 2: “Threaten with, or use, a firearm against any person, except when defending oneself or others. [”]
Serious Offense # 27: “Acting in a damaging, immoral or disorderly manner to the detriment of the Police Department.”

. The dissent faults Lt. Cruz-Sánchez for the fact that he "took Pagán right back in to the TOD,” even though that decision was made by Col. Rivera-Merced. Lt. Cruz-Sánchez’s decision not to countermand his superior cannot be a basis for finding him liable.

. The dissent assumes that Sgt. Colón-Báez "kn[ew] full well of Pagán’s violent past,” but *19 we see nothing in the record to support that speculation. The dissent goes on to say that Sgt. Colón-Báez did not review Pagán’s disciplinary file, "which would have uncovered” that "violent past.”

. We dispose quickly of a side argument. The plaintiffs have not pointed to any evidence of "widespread” abuse that would have alerted the supervisors to "ongoing” systemic constitutional violations. See Maldonado-Denis, 23 F.3d at 582. The plaintiffs’ evidence centers entirely on the Cáceres shooting and the officers involved with it. Without evidence of "widespread” abuse and "ongoing” constitutional violations, the plaintiffs’ case cannot survive summary judgment on a systemic abuse theory. See id.; see also Estate of Bennett v. Wainwright, 548 F.3d 155, 178 n. 7 (1st Cir.2008) (holding evidence insufficient to qualify as widespread under Maldonado-Denis when plaintiff produced evidence that officer who fatally shot mentally ill victim had previously shot another mentally ill individual).

. The dissent counts four "particularly violent” episodes of misconduct in Pagán’s file, *22 presumably counting each of the three domestic violence incidents separately and ignoring the fact that the allegations regarding the motorcyclist were not substantiated. But parsing out the individual events would have been impossible for the two supervisors the dissent would hold liable, since, as the plaintiffs themselves argue, the disciplinary file did not include the underlying facts of the prior incidents.

. The dissent expresses concern that our ruling allows the police a "free bite at the apple.” Not so. A supervisor who has knowledge of and deliberately ignores a subordinate’s history of violent events may well be liable for that subordinate’s later violent acts, even if they are of a different kind than the past acts. What distinguishes this case is not the fact that Pagán's disciplinary record showed off-duty domestic violence rather than assaulting a civilian while on duty. Rather, it is the fact that the single domestic violence complaint on this record — which was from nearly nine years before the shooting, was meaningfully investigated, led to meaningful sanctions, and was followed by no repeat behavior — is far from sufficient to establish that Pagán had the "violent tendencies” the dissent ascribes to him, or to establish that his supervisors should have known he posed a “grave risk” of violence toward civilians in 2007.

. The dissent assumes that a proper review of the disciplinary files would have revealed that Pagán was unfit for duty, ignoring the plaintiffs’ own argument that the files did not include enough information to allow lower-level supervisors to make that determination. Moreover, to the extent that the dissent argues that a more thorough review would have found Pagán unfit for service on the Impact Unit in particular — as appears to be the dissent’s primary complaint against Sgt. Colón-Báez — the dissent never explains how the decision to place Pagán on the Impact Unit was causally related to the shooting.