NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-1353                                           Appeals Court


MARIANNE BAPTISTE[1] & another[2] vs. EXECUTIVE OFFICE OF HEALTH
                AND HUMAN SERVICES & others.[3]


                        No. 18-P-1353.

        Suffolk.     December 4, 2019. - February 28, 2020.

            Present:  Meade, Shin, & Singh, JJ.


Constitutional Law.  Civil Rights, Supervisory liability,
     Immunity of public official.  Massachusetts Tort Claims
     Act.  Governmental Immunity.  Commonwealth, Claim against,
     Liability for tort.  Department of Youth Services.



     Civil action commenced in the Superior Court Department on
April 15, 2016.

     A motion to dismiss was heard by Karen F. Green, J.


     Ira H. Zaleznik for the plaintiffs.

_____

     [1] Individually and as legal guardian and next friend of
Gregory Williams, Jr.

     [2] Gregory Williams, Sr.

     [3] Secretary of the Executive Office of Health and Human
Services; Department of Youth Services; Peter Forbes,
individually and as Commissioner of the Department of Youth
Services; and John Hughes, individually and as regional director
of the Department of Youth Services.

Katherine B. Dirks, Assistant Attorney General, for the defendants.

Philip T. Tierney, for Douglas K. Chin, was present but did not argue.

MEADE, J.  The plaintiffs, Marianne Baptiste and Gregory Williams, Sr., brought this action to recover damages against the defendants, the Massachusetts Executive Office of Health and Human Services (HHS), the Department of Youth Services (DYS), and certain of their employees[4] after a DYS-committed juvenile injured their son, Gregory Williams, Jr. (Williams),[5] while he was in DYS custody at the Casa Isla Short-Term Treatment and Revocation Center (Casa Isla).  As pertinent here, the plaintiffs asserted three claims:  (1) a claim, pursuant to 42 U.S.C. § 1983, against DYS Commissioner Peter Forbes and DYS Regional Director John Hughes in their individual capacities (collectively, DYS individual defendants), for failure to provide adequate medical care in violation of the Eighth and Fourteenth Amendments to the United States Constitution; (2) a negligence claim, pursuant to G. L. c. 258, § 2, against HHS, the Secretary of HHS, and DYS; and (3) a claim pursuant to G. L.

---

[4] Also named in the complaint are Douglas Chin and Volunteers of America of Massachusetts, Inc. (VOA), and certain of its employees.  They are not parties to this appeal.  See note 7, infra.

[5] For the sake of clarity, we shall refer to Gregory Williams, Jr., as "Williams," and to his father as "Gregory Williams, Sr."

c. 231, § 85X, against all of the defendants for Baptiste and Gregory Williams, Sr.'s loss of consortium.  Defendants HHS, the Secretary of HHS, DYS, DYS's Commissioner, and DYS's Regional Director (collectively, Commonwealth defendants) brought a motion to dismiss pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974).[6]  A Superior Court judge allowed the motion, and a separate and final judgment entered for the Commonwealth defendants pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974).[7]  The plaintiffs have appealed.  We affirm.[8]

Background.[9]  1.  The program.  Casa Isla was a program for juvenile males located in a facility (now closed) on Long Island in Boston Harbor.  Casa Isla was operated by Volunteers of America of Massachusetts, Inc. (VOA), a nonprofit entity under contract with DYS to operate youth residential programs.  VOA also operated a separate residential drug and alcohol recovery

---

[6] Although certain unnamed DYS employees were also identified as defendants in each of the above counts, the motion to dismiss was not brought on their behalf.

[7] Neither VOA nor Chin was a party to the Commonwealth defendants' motion to dismiss; VOA and Chin remain defendants in the plaintiffs' suit.

[8] In the Superior Court, the parties agreed that the loss of consortium claim is entirely derivative of the § 1983 and negligence claims; accordingly, we do not discuss it separately.

[9] The facts provided herein are derived from the complaint, which we treat as true for purposes of this appeal.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008).

program for juvenile males on Long Island known as "Project Rebound."  The two programs were housed in separate facilities.

On May 21, 2012, Williams was adjudged a youthful offender, and was committed to DYS's custody and care pursuant to G. L. c. 119, § 58 (c).  On March 25, 2013, following a series of placements, Williams was transferred to Casa Isla to undergo approximately three months of treatment.

2.  The assault.  On the morning of April 19, 2013, Douglas Chin, a seventeen year old resident of Project Rebound, said he wanted to get "kicked out" of Project Rebound and that he wanted to punch someone so he would be returned to Pembroke House.[10]  Later that day, Chin and Williams participated in a flag football game between Casa Isla residents and Project Rebound residents.  Two Casa Isla staff members were supervising the game, in which approximately twenty residents were participating.

During the football game, at approximately 12:00 P.M., Chin ran toward Williams, who was looking in a different direction, and repeatedly struck him with a closed fist on the left side of his throat and jaw.  Prior to the attack, Williams and Chin had

---

[10] The plaintiffs also allege that Chin said that he was going to attack the "big one," referring to Williams.  However, the complaint does not allege that these statements were made to VOA staff, or that VOA knew of the statements at the time of the attack.

not exchanged words and did not know one another. Two Casa Isla staff members intervened and stopped the attack; the football game was suspended, and the Casa Isla residents were instructed to proceed to lunch.

3. <u>Symptoms and injury</u>. At lunch immediately following the game and on two occasions thereafter, Williams complained of a headache to Casa Isla staff.[11] A VOA staff member gave him ibuprofen. No one took Williams to see the nurse on staff or to the hospital. Between 3:35 P.M. and 4:00 P.M., Williams took a shower at the suggestion of VOA staff members, after which he reported feeling better. At approximately 5:00 P.M., Williams told a staff member that, in addition to his headache, he also was experiencing severe pain on his right side, and asked to see a nurse. Residents reported that between 4:15 P.M. and 5:00 P.M., Williams started complaining that he could not feel his legs. The VOA staff member noted that Williams was experiencing facial asymmetry, right side weakness, and trouble speaking. The staff member contacted Boston Emergency Medical Services (Boston EMS) around 5:10 or 5:15 P.M. Boston EMS arrived at 5:40 P.M. and transported Williams to Boston Medical Center.

Williams suffered a traumatic carotid artery dissection and occlusion resulting in a middle cerebral artery stroke,

---

[11] The complaint does not allege to whom Williams complained.

seizures, and cerebral edema.  As a result, he now has severe and permanent brain damage.  Williams currently resides in a residential program and requires twenty-four hour care.

4.  VOA.  For approximately twenty years, VOA had been a support contract vendor under agreement with DYS and HHS, which were responsible for the oversight of VOA.  VOA's contract with DYS required VOA to comply with all applicable provisions of law relative to the care of clients and to implement policies and procedures that are equal to or better than those of DYS.  At the time of the April 19, 2013 assault, DYS regulations then in effect included:  a requirement that "[a]ll facility personnel responsible for the care and custody of clients shall be trained in emergency first-aid procedures," 109 Code Mass. Regs. § 11.26(1) (1993); authorization for the provision of medical care in medical emergencies, see 109 Code Mass. Regs. § 11.04(3) (1993) ("When there is a medical emergency, as determined by any medical provider, no one's consent is required in order to allow a client to receive necessary medical care"); and a requirement that each facility administrator "shall develop written plans and procedures . . . for the secure storage and controlled administration of all medications and drugs."  109 Code Mass. Regs. § 11.28(2) (1993).

In 2002, DYS issued a policy on "Use of Over the Counter (OTC) Medications" that permits nonmedical staff to administer

nonprescription medications under specific conditions, such as when a resident's medical complaint is covered by standing orders, i.e., a "standard of treatment for each patient for a given condition [that is] prepared and signed by a qualified health staff person."

5. The audits. The complaint alleges that the DYS Commissioner and the Regional Director disregarded VOA's noncompliance with safety requirements. In February 2013, DYS conducted a program compliance review of Casa Isla and determined that Casa Isla's director and assistant director were not in compliance with required first-aid training and certifications. However, the plaintiffs' complaint does not allege that Casa Isla's director or assistant director had any involvement in Williams's care on April 19, 2013. DYS had also documented noncompliance with required first-aid training and certifications in 2010, 2012, and 2013, but the complaint does not allege that anyone involved in Williams's care on April 19, 2013, lacked first-aid training and certifications.

A postassault, 2014 audit of Casa Isla conducted by DYS confirmed that several staffers had failed to attend some required trainings, and also reported documentation deficiencies. Casa Isla's log of trainings and certifications does not indicate that "OTC Medication Training" or equivalent training was provided to staff. However, the complaint does not

allege that any of the individuals who did not attend the trainings were involved in Williams's care on April 19, 2013.

Discussion. 1. Standard of review. We review the allowance of a rule 12 (b) (6) motion to dismiss de novo. A.L. Prime Energy Consultant, Inc. v. Massachusetts Bay Transp. Auth., 479 Mass. 419, 424 (2018). We accept "the facts alleged in the complaint as true and draw[] all reasonable inferences in the plaintiff[s'] favor." Edwards v. Commonwealth, 477 Mass. 254, 260 (2017). However, "[w]e do not regard as 'true' legal conclusions cast in the form of factual allegations." Id., quoting Leavitt v. Brockton Hosp., Inc., 454 Mass. 37, 39 n.6 (2009). To survive a motion to dismiss, the facts alleged must "'plausibly suggest[] (not merely [be] consistent with)' an entitlement to relief." Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully" (citation omitted). Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

2. Supervisory liability under § 1983. a. Underlying constitutional violation. Title 42 U.S.C. § 1983 (2012) provides in relevant part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States

or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

Section 1983 is "not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred" (quotation and citation omitted). Graham v. Connor, 490 U.S. 386, 393-394 (1989).

Governmental actors "are responsible only for 'their own illegal acts'" (emphasis omitted). Connick v. Thompson, 563 U.S. 51, 60 (2011), quoting Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986). However, they may be liable under § 1983 if the governmental actors themselves "subject[]" a person to a deprivation of rights or "cause[]" a person "to be subjected" to such deprivation. See Monell v. Department of Social Servs. of the City of N.Y., 436 U.S. 658, 692 (1978). In other words, for purposes of § 1983, agency officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." Iqbal, 556 U.S. at 676. Of course, supervisory liability itself is premised on there being an underlying constitutional violation of the plaintiff's rights by agency subordinates. The existence of an Eighth Amendment violation must be evaluated before determining whether the agency officials were deliberately indifferent to a plaintiff's serious medical needs, and whether there is a direct causal link

between an agency policy or custom and the constitutional deprivation. See Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018); Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008). See also Rivera v. R.I., 402 F.3d 27, 39 (1st Cir. 2005) (§ 1983 liability for failure to train or for inadequately training employees premised on underlying constitutional violation of plaintiff's rights [citation omitted]); Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581-582 (1st Cir. 1994) (to establish supervisory liability, plaintiff must first show underlying constitutional violation).

Here, the plaintiffs claim that the underlying constitutional violation was that, in violation of the Eighth Amendment, the VOA staff members provided inadequate medical care to Williams, who was in DYS custody. However, the Eighth Amendment does not protect against merely inadequate medical care. Rather, it protects against deliberate indifference to a serious medical need, constituting an "unnecessary and wanton infliction of pain" (citation omitted). Estelle v. Gamble, 429 U.S. 97, 104 (1976).

Eighth Amendment claims have both an objective component and a subjective component. Zingg, 907 F.3d at 635. Here, the objective component requires the plaintiffs to prove that Williams had a medical need "that [had] been diagnosed by a physician as mandating treatment, or one that [was] so obvious

that even a lay person would easily recognize the necessity for a doctor's attention" (citation omitted).  Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014).  "The subjective component requires the plaintiff[s] to show that [VOA employees], in treating [Williams's] medical needs, possessed a sufficiently culpable state of mind.  That state of mind is one that amounts to deliberate indifference to [Williams's] health or safety." Zingg, supra.  To establish a deliberately indifferent state of mind, the plaintiffs must "provide evidence that the [VOA employees] had actual knowledge of impending harm, easily preventable, . . . and yet failed to take the steps that would have easily prevented that harm.  Such a showing may be made by demonstrating that the defendant[s] provided medical care that was so inadequate as to shock the conscience, . . . or, put otherwise, that was so clearly inadequate as to amount to a refusal to provide essential care" (quotations and citations omitted).  Id.

However, "an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind" (quotations omitted).  Estelle, 429 U.S. at 105-106. That is, an accident or mere negligence that produces pain and suffering cannot by itself be characterized as a wanton infliction of unnecessary pain.

Here, as alleged, when Williams complained of a headache, VOA staff gave him ibuprofen but did not refer him to medical services for assessment. This does not suffice as an allegation that VOA had actual knowledge of any easily preventable, impending harm to Williams, "and yet failed to take the steps that would have easily prevented that harm." Zingg, 907 F.3d at 635. Instead, the plaintiffs' allegations amount to no more than negligence, which does not rise to the level of a constitutional violation. See Estelle, 429 U.S. at 106; Braga v. Hodgson, 605 F.3d 58, 61 (1st Cir. 2010).

b. Deliberate indifference. Supervisory liability under § 1983 is different in kind from vicarious liability. That is, "[a]lthough a supervisor need not personally engage in the subordinate's misconduct in order to be held liable, his own acts or omissions must work a constitutional violation." Parker v. Landry, 935 F.3d 9, 15 (1st Cir. 2019). See Iqbal, 556 U.S. at 676. "Facts showing no more than a supervisor's mere negligence vis-à-vis his subordinate's misconduct are not enough to make out a claim of supervisory liability." Parker, supra. "At a minimum, the plaintiff must allege facts showing that the supervisor's conduct sank to the level of deliberate indifference." Id. "A showing of deliberate indifference has three components: 'the plaintiff must show "(1) that the officials had knowledge of facts, from which (2) the official[s]

can draw the inference (3) that a substantial risk of serious harm exists."'" Id., quoting Guadalupe-Báez v. Pesquera, 819 F.3d 509, 515 (1st Cir. 2016). See Board of Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 410 (1997) ("'[d]eliberate indifference' is a stringent standard of fault, requiring proof that a[n agency employee] disregarded a known or obvious consequence of his action").

Even if we were to assume that the action or inaction by the VOA employees violated the Eighth Amendment, the motion judge properly found that the plaintiffs failed to allege sufficient facts to suggest that the DYS individual defendants were on notice of, and were deliberately indifferent to, the existence of a substantial risk of serious harm. As the judge held, "[t]he plaintiffs allege only that[, as a result of the 2010, 2012, and 2013 audits,] the DYS [individual d]efendants were aware of VOA[]'s noncompliance with the requirement that all facility personnel responsible for the care and custody of youth have emergency first-aid training, as set forth in 109 Code Mass. Regs. § 11.26 . . . ." However, as the judge held, knowledge of noncompliance with a single safety regulation "does not plausibly suggest that the DYS [individual d]efendants were on notice" of the existence of a substantial risk of serious harm or that they were deliberately indifferent to such a risk. See Ramirez-Lluveras v. Rivera-Merced, 759 F.3d 10, 20-22 (1st

Cir. 2014). See also Parker, 935 F.3d at 15 ("isolated instances of a subordinate's constitutional violations . . . will not clear the causation bar" [quotation and citation omitted]).

Furthermore, the plaintiffs do not allege that the DYS individual defendants had any involvement with VOA or the Casa Isla program, or more specifically, with medicine administration policies or staff members' training and certification records. Although the plaintiffs allege that DYS had identified deficiencies in VOA's certifications and training, they do not allege that the DYS individual defendants were aware of this. The plaintiffs allege that VOA did not adhere to a DYS policy on the controlled administration of medications, but they do not allege that the DYS individual defendants were aware of, let alone encouraged, condoned, or acquiesced to, this alleged nonadherence. See Connick, 563 U.S. at 61 (["a supervisor's] culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train"). See also Oklahoma City v. Tuttle, 471 U.S. 808, 822 (1985) (alleged policy of inadequate training "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell").

Finally, the plaintiffs do not allege that the DYS individual defendants had notice of any prior failures by VOA

staff members to monitor residents' injuries or symptoms, which might have indicated a risk of a violation of Williams's Eighth Amendment rights.  More directly, the plaintiffs do not allege that the DYS individual defendants engaged in any "supervisory encouragement, condonation or acquiescence" that amounted to deliberate indifference to any VOA conduct.  Pineda, 533 F.3d at 54.  The DYS individual defendants cannot be deliberately indifferent to an omission or deficiency in a first-aid training program of which they had no knowledge.

c.  Affirmative link.  Finally, for a supervisor to be held liable for a subordinate's constitutional violation, there must be "an affirmative link" between the subordinate's behavior and the supervisor's action or inaction "such that the supervisor's conduct led inexorably to the constitutional violation" (citation omitted).  Morales v. Chadbourne, 793 F.3d 208, 221 (1st Cir. 2015).  See Guadalupe-Báez, 819 F.3d at 515 (affirmative link requires conduct that can be "characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference" [citation omitted]).

Here, the plaintiffs failed to allege any causal connection, let alone a strong one, between VOA's alleged noncompliance with the first-aid training requirements of 109 Code Mass. Regs. § 11.26 and Williams's injuries.  As the motion

judge held, the plaintiffs do "not allege that any facility personnel who supervised [Williams] on the day of the incident had not received the required emergency first aid training. [Rather, they] merely allege generally that the DYS [individual] defendants were on notice that some VOA[] staff had not received such training in the past and that the failure of VOA[] staff members to administer proper emergency first aid treatment on the day of the incident worsened [Williams's] injuries.  [In other words,] the plaintiffs have failed to allege any affirmative link between the DYS [individual d]efendants' alleged conduct, and the alleged violation of [Williams's] Eighth Amendment right to adequate medical care."  See Guadalupe-Báez, 819 F.3d at 515; Maldonado-Denis, 23 F.3d at 582.  The § 1983 count of the complaint against the individual DYS defendants was properly dismissed.

    3.  Immunity from negligence claim under public duty rule. The plaintiffs also brought a negligence claim, pursuant to the Massachusetts Tort Claims Act (act), G. L. c. 258, § 2, against HHS and DYS.[12]  This claim is actually against the Commonwealth, and it too was properly dismissed.

_____

    [12] The plaintiffs also named the Secretary of HHS, in her official capacity, as a defendant in this count, but concede that she is immune from liability under c. 258.  The complaint did not name her as a defendant in her individual capacity.

The act is a limited waiver of the Commonwealth's sovereign immunity. See Cormier v. Lynn, 479 Mass. 35, 39 (2018). Within the act are a variety of exclusions from that limited waiver. One such exclusion can be found in G. L. c. 258, § 10 (j), which provides the Commonwealth immunity from suit for

> "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer."

See Kent v. Commonwealth, 437 Mass. 312, 317 (2002). Section 10 (j) has been described as a "'statutory public duty rule providing governmental immunity,' Carleton v. Framingham, 418 Mass. 623, 627 (1994), the purpose of which is to 'provide some substantial measure of immunity from tort liability to government employers.' Brum v. Dartmouth, [428 Mass. 684,] 695 [(1999)]." Kent, supra at 317-318. The Supreme Judicial Court has construed the "original cause" language to mean an affirmative act (not a failure to act) by a public employer that "materially contributed to creating the specific 'condition or situation' that resulted in the harm" inflicted by a third party. Cormier, supra at 40, quoting Kent, supra at 319. In other words, § 10 (j) provides immunity from tort liability to public employers "for a public employer's act or failure to act to prevent harm from the wrongful conduct of a third party

<u>unless</u> the condition or situation was '<u>originally caused</u>' by the public employer." <u>Cormier</u>, <u>supra</u>, citing <u>Brum</u>, <u>supra</u> at 692, 695.

Here, as the plaintiffs expressly pleaded, Williams's condition or situation resulted "from Chin's closed-fist strike to the left side of Mr. Williams'[s] neck." The two had never met, and the attack was unprovoked. The plaintiffs do not allege that Commonwealth employees committed any actual affirmative act that led to Chin's assault on Williams, nor do they claim that DYS had any interactions with or knowledge of Chin before the assault. Rather, the plaintiffs repeatedly allege conduct that amounts to failure to prevent the injury caused by a third party and characterize it as an alleged failure by VOA staff to recognize the severity of Williams's injury and an alleged failure by DYS to provide more monitoring and oversight of VOA's program at Casa Isla.[13] These

---

[13] Examples of allegations in the complaint include the following: "Williams was neither sent to Boston Medical Center for a medical assessment, nor provided with any medical treatment following the attack"; DYS "failed to prepare any written policy or procedure detailing criteria or assessment protocols for evaluating whether . . . or not a resident is in need of a medical assessment by trained medical professionals"; DYS "failed . . . to ensure . . . Williams was provided adequate protection from harm by fellow involuntarily confined youths and adequate medical care"; DYS "failed . . . to ensure that VOA[] complied with all of its legal obligations," including certification and training requirements; and VOA did not have a written policy for the administration of over-the-counter medications.

allegations, however, are exactly the type of failure to prevent or diminish the harmful consequences of negligence claims that are barred by § 10 (j).[14]  To hold otherwise would be to "adopt an interpretation of [§ 10 (j)] that construes the words 'originally caused' so broadly as to encompass the remotest causation and preclude immunity in nearly all circumstances." Brum, 428 Mass. at 695.  See Jane J. v. Commonwealth, 91 Mass. App. Ct. 325, 330 (2017) (hospital's failure to segregate patients by gender not original cause of female patient's rape by male patient); Jacome v. Commonwealth, 56 Mass. App. Ct. 486, 490 (2002) (failures to close beach, post warning signs, and failure of lifeguards to remain on duty during scheduled shift not original cause of drowning).

Finally, the plaintiffs claim that two exceptions to governmental immunity found in G. L. c. 258, § 10 (j) (2), (4),

---

[14] The plaintiffs' reliance on Devlin v. Commonwealth, 83 Mass. App. Ct. 530 (2013), is misplaced.  In that case, a civilly committed patient was assaulted by a criminal convict working at the facility.  We concluded that § 10 (j) did not bar the claim because an original cause of the assault was the Commonwealth's "affirmative decision to allow convicted inmates[, who come from a higher-risk population,] to work in an area where civilly committed individuals were housed and treated . . . ."  Id. at 535.  Here, however, the plaintiffs do not allege that DYS had notice that Chin came from a higher-risk population than Williams, or any other basis for asserting that DYS had notice of the risk of an assault.  In fact, as alleged, Williams, as a youthful offender, was a higher-risk resident than Chin, who was merely enrolled in a civil drug and alcohol recovery program.

defeat HHS and DYS's immunity.  The two provisions are as follows:

> "(2) any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention; and
>
> . . .
>
> "(4) any claim by or on behalf of a patient for negligent medical or other therapeutic treatment received by the patient from a public employee."

G. L. c. 258, § 10 (j) (2), (4).  The plaintiffs claim that VOA's response on April 19, 2013, comes within the purview of both of the above exceptions, and thus that HHS and DYS are liable for that response.  We disagree.

According to the complaint, VOA is an independent contractor.  The plaintiffs do not claim that VOA employees are "public employees," as defined by G. L. c. 258, § 1, such that their actions fall within the exceptions of § 10(j) (2), (4).  Nor does the complaint allege, as the motion judge properly held, any facts that plausibly suggest that any VOA staff member was a public employee.  Because, within the meaning of the act, "an independent contractor is not a public employee," Chiao-Yun Ku v. Framingham, 62 Mass. App. Ct. 271, 274 (2004); Thornton v. Commonwealth, 28 Mass. App. Ct. 511, 513 (1990), and because the complaint does not allege that DYS had "retained control" over any part of the work covered by VOA's contract, see Chiao-Yun

Ku, supra at 274-275, the exceptions to governmental immunity do not apply.

Judgment affirmed.